NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210677-U

NO. 4-21-0677

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 27, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| DAVID BEVERLY, | ) | No. 15CF510 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| | ) | Judge Presiding. |

_____

JUSTICE HARRIS delivered the judgment of the court.
Justices Turner and Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*:   (1) The circuit court did not err by dismissing some of defendant's postconviction claims at the second stage of proceedings based upon the finding that defendant failed to make a substantial showing of a constitutional violation.

(2) Defendant failed to establish that his postconviction counsel provided unreasonable assistance at his third-stage evidentiary hearing.

(3) Defendant failed to establish that his postconviction counsel provided unreasonable assistance for failing to properly frame or adequately support his claims.

¶ 2    Defendant, David Beverly, appeals following the circuit court's third-stage denial of his postconviction petition. He argues (1) the court erred by dismissing some of his claims at the second stage of postconviction proceedings on the basis that he failed to make a substantial showing of a constitutional violation, (2) his postconviction counsel provided unreasonable assistance at his third-stage evidentiary hearing, and (3) his postconviction counsel provided

unreasonable assistance by failing to properly frame or adequately support all of the claims raised in his petition. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Following a January 2016 jury trial, defendant was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2014)), and sentenced to 75 years in prison. On direct appeal, this court affirmed defendant's murder conviction, but vacated his sentence and remanded for resentencing on the basis that the trial court relied on a void prior conviction when imposing defendant's sentence. *People v. Beverly*, 2019 IL App (4th) 160168-U. Before defendant's resentencing could occur, he initiated the postconviction proceedings that are currently at issue.

¶ 5        The underlying facts of defendant's case were set out in detail in our previous decision. We briefly summarize them here. The State's theory of the case was that defendant shot the victim, Arsenio Carter, in retaliation for the shooting of defendant's friend, Kytiece Frazier, who had been shot by Carter's friend, Tarrell Boatman. The State presented evidence that close relationships existed between the two sets of individuals, and that Boatman pleaded guilty to shooting Frazier.

¶ 6        The State's evidence further showed that on April 10, 2015, Carter attended a barbecue at Oakwood Trace Apartments in Champaign, Illinois. He was shot around 6 p.m., as he sat in the front passenger seat of his girlfriend, Dreshana Caston's, parked vehicle. Carter later died as a result of a gunshot wound to the chest. A 9-millimeter bullet was recovered from Carter's body and a 9-millimeter cartridge casing was recovered at the scene of the shooting.

¶ 7        Caston was an eyewitness to the shooting and identified defendant as the shooter. Evidence showed she was sitting in the driver's seat of her vehicle and next to Carter when the shooting occurred. Caston testified she knew defendant from previous encounters, saw his face,

and recognized his tattoos and dreadlocks. Immediately prior to the shooting, Caston became "worried" because she saw an individual named Deveonta Lindsey looking at her car with a "mean face." Caston then saw defendant, who she described as wearing a black hoodie and a blue latex glove, approach her vehicle, pull out a gun, and shoot Carter. Caston drove Carter to the hospital, where she spoke to the police and identified defendant as the shooter by showing a police officer defendant's Facebook photo on her cell phone.

¶ 8        Cynthia Lubamba testified she dated defendant. Around 6 p.m. on the night of the shooting, defendant "kept calling" her and asked her for "a ride." Around 7 or 8 p.m., she picked defendant up at Panera Bread in Champaign and drove him to Brookstone Court.

¶ 9        The police found text messages on defendant's cell phone between defendant and Lubamba, which "described her picking him up at Panera[.]" Detective Patrick Funkhouser, who investigated Carter's murder, testified that the "time listed" for the "Panera text" was 6:23 p.m. He also estimated that the "driving time" between Panera Bread and the location of the shooting was 10 to 11 minutes.

¶ 10        Around 11 p.m. on the night of the shooting, defendant called Lubamba again and asked for a ride. She picked defendant up from Brookstone Court and drove him to a gas station, where he was arrested by the police. At the time of defendant's arrest, the police found two blue latex gloves in his pants pocket. Evidence showed that around 11 a.m. on the day of the shooting, defendant visited Frazier at the hospital, where Frazier was recovering from his gunshot wounds. Video surveillance footage from the hospital showed defendant wearing a "black zippered hoodie." Inside Frazier's hospital room, there were wall dispensers that contained blue latex gloves.

¶ 11        On April 13, 2015, the police executed a search warrant at a Brookstone Court apartment where one of Deveonta Lindsey's girlfriends resided. The apartment was also located

"in [the] area" where Lubamba picked defendant up prior to his arrest. Inside the apartment, the police located two black hooded sweatshirts and a purse that contained a plastic bag with 9-millimeter bullets and casings.

¶ 12          During his case-in-chief, defendant presented testimony from Wendy Driver. Driver testified she resided at Brookstone Court and was friends with defendant. She drove defendant to the hospital on the morning of the shooting. Around 4 p.m., she went to Walmart with defendant. Surveillance footage from Walmart showed defendant entering the store at 4:38 p.m. and exiting at 4:44 p.m. Driver testified that after leaving Walmart, she and defendant "hung out" at her residence for "a little while" before defendant left. Approximately 10 to 20 minutes after leaving her apartment, defendant called and asked for "a ride to Panera Bread[.]" Defendant met Driver at her apartment complex, and she drove him to Panera Bread as he requested. Driver did not remember what time she drove defendant to Panera Bread, but she stated that "the sun was setting and it was shining in [her] eyes as [she] [was] driving."

¶ 13          Defendant testified on his own behalf. He denied shooting Carter or being present at the scene when the shooting occurred. He testified that on the morning of the shooting, Driver took him to the hospital to visit Frazier. He acknowledged attending the barbecue at Oakwood Trace Apartments later in the day but asserted that Driver picked him up about 4 p.m. to go to Walmart. After leaving Walmart, they returned to Driver's apartment for 30 to 45 minutes. Upon leaving Driver's apartment, defendant visited a relative of Frazier's before he returned to Driver's apartment complex, and she drove him to Panera Bread. Defendant asserted he arrived at Panera Bread at "6 something." He recalled that the "sun [was] setting" as they were on their way there. Defendant estimated that Lubamba picked him up from Panera Bread at "probably like 6:40, 6:50 [p.m.]" or around 7 p.m.

¶ 14 Defendant acknowledged taking blue latex gloves from Frazier's hospital room on the day of the shooting. However, he asserted that he took them because he had eczema on his hands and wore gloves "a lot."

¶ 15 The State called Caston and Lubamba as rebuttal witnesses. Caston testified that on the occasions she saw defendant prior to the shooting, "[h]e never had on any gloves." Similarly, Lubamba did not recall defendant "ever wearing gloves" during the time period that they dated from February to April 2015. Lubamba also clarified that on the day of the shooting, she picked defendant up from Panera Bread at approximately 7:30 p.m.

¶ 16 The parties entered into several stipulations. Specifically, they stipulated that (1) deoxyribonucleic acid (DNA) collected from defendant was compared to DNA from the black hooded sweatshirts found in the Brookstone Court apartment, and the comparison was deemed inconclusive; (2) the 9-millimeter cartridge casing recovered from the scene was tested for latent fingerprints, but none were found; (3) no gunshot residue was detected on the latex gloves found in defendant's pocket after his arrest or on the black hooded sweatshirts found in the Brookstone Court apartment; (4) gunshot residue might not be detectible for several reasons and the absence of gunshot residue on a person did not mean that the person had not discharged a firearm; and (5) sunset on the day of the shooting was at 7:26 p.m.

¶ 17 As stated, defendant was found guilty of Carter's murder and his conviction was affirmed on direct appeal. In April 2021, defendant filed a postconviction petition with the assistance of privately retained counsel. He raised numerous allegations that his trial attorney, Dan Jackson, provided ineffective assistance. His petition included allegations that, prior to trial, Jackson improperly failed to (1) communicate with defendant, show defendant discovery in the case, or discuss with defendant the State's evidence; (2) review available discovery and locate

geolocational data from defendant's cell phone that would have established defendant was not present at the scene of the shooting when it occurred; (3) locate and interview occurrence witnesses Joseph Carter, Jason Eatman, Darnell Hayes, and Tolanda Boykins; (4) speak with and prepare Driver, defendant's alibi witness, to testify; (5) interview Caston or properly prepare for Caston's testimony; (6) interview Lubamba; (7) prepare defendant to testify; (8) discuss stipulations in the case with defendant; and (9) file motions *in limine* to exclude evidence.

¶ 18 Defendant also alleged several ways in which Jackson allegedly provided ineffective assistance during the course of his jury trial. Specifically, in his petition, he asserted Jackson failed to effectively develop defendant's alibi defense by not (1) eliciting testimony from Driver regarding the route she took when driving defendant to Panera Bread, (2) objecting to testimony about the approximate drive time from the scene of the shooting to Panera Bread, and (3) seeking to admit a written copy of the text message Lubamba sent to defendant that "proved the time at which Lubamba arrived to pick up *** defendant at Panera Bread." Defendant also alleged Jackson failed to call occurrence witnesses on his behalf, including Joseph Carter, Jason Eatman, and Talonda Boykins. He asserted Jackson improperly failed to object to certain testimony; entered into stipulations that were detrimental to his defense; failed to admit "key pieces of evidence," including clothing he wore on the day of the offense; "failed to develop the relationships between the individuals allegedly involved or the lack thereof"; and failed to elicit testimony from Caston that would have damaged her credibility.

¶ 19 Finally, in his postconviction petition, defendant alleged Jackson was ineffective after his trial for failing to file a "complete" posttrial motion. He also alleged his appellate counsel on direct appeal was ineffective for failing to raise any of the claims set forth in his petition. Defendant attached various documents to his petition, including his own affidavit; the affidavits

of Joseph (because Joseph Carter has the same last name as the victim, we refer to him by his first name), Eatman, and Boykins; police reports; cell phone records, including a transcript of text messages purportedly exchanged between himself and Lubamba; transcripts from the underlying trial proceedings; and the motion for a new trial filed by Jackson.

¶ 20 In his affidavit, Joseph asserted that he was present at Oakwood Trace Apartments on the day of the shooting. He was familiar with defendant, but "would not say that [the two] were friends." Joseph maintained he "was in the area when the shooting occurred" but "did not see [defendant] there at the time." When the shooting happened, Joseph looked in the direction of where the shots were fired and could see "a male running away from" Caston's vehicle. He thought that person was the shooter and stated the man he saw "was definitely not" defendant. Joseph further maintained that he spoke with the police about the incident, but Jackson never tried to contact or interview him. He would have been willing to testify on defendant's behalf if he had been asked.

¶ 21 In her affidavit, Boykins asserted she was also present at Oakwood Trace Apartments around the time of the shooting. She was familiar with defendant and observed him at the barbecue around 3 p.m. When she saw defendant, he was wearing blue latex gloves. Boykins averred that she had seen defendant wearing gloves in the past and it was her understanding that he did so "due to excema [*sic*]." Boykins asserted that defendant left the barbecue about an hour after she arrived, and she did not see him return to the area. Further, Boykins stated she "was in the area when the shooting occurred later and [she] did not see [defendant] there." According to Boykins, defendant "was not present" when Carter was shot. Additionally, she maintained that she spoke with the police after the shooting. Although she was willing to testify on defendant's behalf, Jackson never interviewed her about the case.

¶ 22 Finally, Eatman averred that between 6 or 7 p.m. on the day of the shooting, he went to Oakwood Trace Apartments to meet a friend who lived at that location. While there, he observed "a light[-]skinned male with short dread locks, with a face full of tattoos, run pas[t] [him]." The man had a gun that "he was tryin[g] to put back in his hoody," and he was running with another individual, who was "light[-]skinned" and had gold teeth. According to Eatman, neither individual was defendant, who Eatman knew "from around Champaign." Although Eatman later learned someone was killed in the area and that defendant was arrested for the crime, he did not report what he had seen to the police because he did not want the police bothering him. It was not until Eatman and defendant ended up "in the same prison" that Eatman reached out to defendant.

¶ 23 The circuit court advanced defendant's postconviction petition to the second stage of postconviction proceedings. In June 2021, the State filed a motion to dismiss defendant's petition and, in July 2021, defendant filed a reply to the State's motion.

¶ 24 In August 2021, the circuit court entered a lengthy written order in which it granted in part and denied in part the State's motion to dismiss. The court dismissed the vast majority of defendant's claims, finding his petition and accompanying documentation failed to make a substantial showing of a constitutional violation. The court found those claims were either rebutted by the record or "vague, conclusory[,] or speculative." Additionally, it stated that many of defendant's claims lacked "specificity to show that counsel's actions were inappropriate or that the outcome of the proceeding would have been different."

¶ 25 The circuit court advanced two of defendant's claims for a third-stage evidentiary hearing. Specifically, it determined defendant made a substantial showing of a constitutional violation with respect to his claims that Jackson was ineffective for failing to locate, interview,

and present testimony from Joseph and Boykins.

¶ 26        In November 2021, the circuit court conducted a hearing in the matter. At the outset of the hearing, defendant's postconviction counsel, Jamie Propps, informed the court that Boykins was not present for the hearing, although she had been served with a subpoena. She asked that the court hear testimony from Joseph, who was present from the Illinois Department of Corrections, and then grant defendant a continuance "to try to secure *** Boykins'[s] appearance" in court. The State objected, arguing the case had "been set for a great deal of time" and that it also had witnesses who were present. The court elected to proceed with the hearing and revisit the issue of a continuance after hearing testimony from other witnesses. Ultimately, the record shows Propps decided not to seek a continuance based on Boykins's absence.

¶ 27        At the hearing, Joseph testified that on April 10, 2015, he was present for the barbecue at Oakwood Trace Apartments. At that time, he had seen defendant around, but he did not know exactly who defendant was. Joseph recalled the shooting and testified that when he "heard the shots" he "ducked" but then "got up to look around and see what was going on." He did not know how far away he was from the location of the shooting, stating, "I really wouldn't know the distance, but I was fairly, like, I guess you would say in the middle kind of far. I wasn't far away, but I was there." Joseph looked in the direction of where the shots had been fired and saw "a truck pulling off" and "a male running the opposite way of everybody else." Joseph believed the person he saw running was the shooter because the person was running in a different direction than others at the scene. The person he saw was not defendant.

¶ 28        Joseph acknowledged that he spoke with the police about the shooting shortly after it occurred. He agreed that he reported that he saw defendant on the scene, but he did not remember telling the police that "there was a lot of stuff going on" at the time of the shooting. He denied

- 9 -

stating that he was wearing earbuds when the shooting occurred. Further, he asserted that he was scared when speaking to the police, in part, because they accused him of being involved in the shooting. Joseph testified that he did not know the identity of the shooter. Additionally, he stated he never received any phone calls about the case from Jackson, defendant's trial attorney. If he had, he would have spoken with Jackson and been willing to testify at defendant's trial.

¶ 29    On cross-examination, Joseph acknowledged that he only saw the back of the person that he observed running away from the shooting, not the person's face, and that he did not see the person holding a gun. He agreed that when he previously spoke with the police, he told them he "heard nothing" and "seen nothing." Joseph acknowledged that he might have reported that he was talking on the phone with his girlfriend when the shooting happened and that he was not sure that he heard the gunshots because there was a train going by and a lot of noise. He did not remember the police asking him if he saw anyone run away from Caston's vehicle. Additionally, he asserted his memory of the event was "probably better" at the time of the evidentiary hearing than it was at the time of the incident. Finally, Joseph acknowledged having a criminal history that included two prior felony convictions for possession of a firearm by a felon and a felony conviction for "theft with a prior."

¶ 30    The State presented testimony from Detective Dennis Baltzell, who investigated the shooting. Baltzell testified he interviewed Joseph, and he identified a video recording of that interview. The State moved for the admission of the video, and Propps objected on the basis of "a discovery issue," arguing she had not seen the video. According to Propps, Jackson, who was then deceased, "had completely destroyed [his] file" and she had difficulty obtaining discovery from the State. Propps acknowledged, however, that "[t]he State provided the discovery in the eleventh hour," enabling her to file defendant's postconviction petition, and that she had not asked the

circuit court for assistance in obtaining any discovery. In response, the State maintained that it had "disclosed the entire file" to Propps. It asserted that once it was established that Jackson's file was not available, it sent Propps "everything along with directions that all of the materials should be here." The State maintained that Propps voiced no complaints thereafter.

¶ 31    The circuit court overruled Propps's objection and allowed the video of Joseph's interview to be admitted. It stated that Propps would be entitled to a continuance if needed "to be able to find evidence or come up with argument to contradict this video." Ultimately, Propps did not request a continuance.

¶ 32    The video of Joseph's interview was published at the hearing. During the interview, conducted by Detectives Baltzell and Funkhouser, Joseph reported that he did not see the shooting and did not see anyone running away from Caston's vehicle. He indicated he was not sure whether he heard gunshots and that his attention was not drawn to the area of the shooting until he heard Caston's vehicle pulling away. He further reported that there had been music playing, people talking, children playing, and the sounds of a train. Joseph maintained that he had been on his phone with his earbuds in and he did not see or hear anything.

¶ 33    Baltzell denied that before the interview, either he or Funkhouser suggested to Joseph that he was a suspect in the case. According to Baltzell, the police already had the name of the person who was alleged to have committed the crime. On cross-examination, he acknowledged that other individuals he spoke with indicated that Joseph had been involved in the incident. When he interviewed Joseph, it was his intention to determine if Joseph drove defendant to the scene of the shooting.

¶ 34    In rebuttal, Joseph testified that the reason he agreed to be interviewed was because the police "were saying that *** [he] did it." He stated he had concerns because he was on parole,

and he was scared the detectives would inform his parole officer about the incident. Joseph maintained that at the time of the interview, he was trying to distance himself from the shooting.

¶ 35        Defendant also testified at the hearing on his own behalf. He asserted he retained Jackson to represent him at his trial. During the course of that representation, he had discussions with Jackson about calling certain witnesses, including Joseph and Boykins. According to defendant, Jackson stated they "didn't need" Joseph and he never responded to defendant's request to call Boykins. It was defendant's opinion that Jackson was "rushing" him to trial because defendant was not paying him enough money.

¶ 36        On November 10, 2021, the circuit court entered a written order, finding defendant failed to prove that his constitutional rights were violated and denying his postconviction petition. The court found defendant's claims with respect to Boykins were waived because she was not called to testify at the evidentiary hearing. With respect to defendant's claim that Jackson was ineffective for failing to investigate or call Joseph as a witness, the court determined that defendant had not established either that Jackson's performance was deficient or that defendant suffered prejudice. Initially, the court stated that given Joseph's prior statements to the police—indicating he was not paying close attention to the area of the shooting and did not see anyone running away— Jackson had no valid reason to contact Joseph or call him as a witness at trial. It also concluded that there were strategic reasons for Jackson not to call Joseph, including that Joseph was a convicted felon on parole and because his credibility could have been attacked.

¶ 37        Regarding prejudice, the circuit court stated it had "serious doubts about [Joseph's] credibility" and that it did not believe Joseph's testimony would have changed the outcome of defendant's trial. In particular, the court stated as follows:

        "[Joseph] has felony convictions which the Court can consider as to his credibility.

He also admitted on the stand that he lied to police officers because he was on parole at the time and was near a shooting, he did not want [to be] implicated. He claims that the police questioning him were threatening and pressuring him[.] However, the video of the questioning does not show threats at all[.] In fact, [Joseph] received a phone call [during the interview] and officers said he would not be there long[.] Incredibly, [Joseph] stated that his memory of the event was better in 2021 than it was in 2015[.] On the stand[,] he was defensive about prior statements, not recalling many he made to the police[.] While it is true that he does not appear to have anything to gain now, since he does not know the Defendant, on balance, the Court has concerns about his credibility[.]"

The court further stated that even if a jury had found Joseph was credible, his testimony was "of limited assistance to the issue of who the shooter was." In particular, the court noted the person Joseph described as the shooter was running away from him. Joseph did not see the person's face or see the person with a gun.

¶ 38　　　　　This appeal followed.

¶ 39　　　　　　　　　　　II. ANALYSIS

¶ 40　　　　　　　　A. Second-Stage Dismissal of Defendant's Claims

¶ 41　　　　　On appeal, defendant first challenges the circuit court's dismissal of two of his postconviction claims at the second stage of proceedings. In his petition, defendant alleged Jackson provided ineffective assistance by failing to present evidence that corroborated his testimony that he was not present at the Oakwood Trace Apartments at the time of the shooting. Specifically, defendant argued Jackson improperly failed to present (1) "geolocational data" from his cell phone that would have shown he was not at that location and (2) a "hard copy of the 6:23 p.m. 'At

[P]anera' text message extracted from *** Lubamba's phone." Defendant maintains he made a substantial showing of a constitutional violation as to both of those claims and, thus, the court should have advanced them to the third stage of postconviction proceedings.

¶ 42         "The Post-Conviction Hearing Act [(Act)] provides a procedural mechanism through which criminal defendants can assert that their federal or state constitutional rights were substantially violated in their original trials or sentencing hearings." *People v. Buffer*, 2019 IL 122327, ¶ 12, 137 N.E.3d 763. A postconviction petition must clearly set forth the ways in which a defendant claims his constitutional rights were violated. 725 ILCS 5/122-2 (West 2020). Also, "[t]he petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." *Id.*

¶ 43         "The Act provides a three-stage process for the adjudication of postconviction petitions." *Buffer*, 2019 IL 122327, ¶ 45. "At the first stage, the circuit court has 90 days to review a petition and may summarily dismiss it if the court finds it is frivolous and patently without merit." *People v. Pendleton*, 223 Ill. 2d 458, 472, 861 N.E.2d 999, 1007 (2006). "If the petition is not dismissed within that 90-day period, the circuit court must docket it for further consideration." *Id.* (citing 725 ILCS 5/122-2.1(b) (West 2000)).

¶ 44         Once a postconviction petition moves from the first to the second stage, the circuit court may appoint counsel to represent the defendant and the State may file responsive pleadings. *People v. House*, 2021 IL 125124, ¶ 17, 185 N.E.3d 1234. During the second stage, the court determines "whether the postconviction petition and any accompanying documentation make a substantial showing of a constitutional violation." *Id.* When such a showing is made, the petition is advanced for a third-stage evidentiary hearing. *Id.* However, if a defendant fails to make a substantial showing of a constitutional violation, his postconviction claims are subject to dismissal.

*Id.*; see also *People v. Cabrera*, 326 Ill. App. 3d 555, 564, 764 N.E.2d 532, 538-39 (2001) (finding the partial dismissal of a defendant's postconviction petition at the second stage of proceedings is permissible). The court's dismissal of a defendant's claims is subject to *de novo* review. *People v. Johnson*, 2017 IL 120310, ¶ 14, 77 N.E.3d 615.

¶ 45          At the second stage, "[t]he inquiry into whether a post-conviction petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations." *People v. Coleman*, 183 Ill. 2d 366, 385, 701 N.E.2d 1063, 1073 (1998). Instead, all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true. *Pendleton*, 223 Ill. 2d at 473. Our supreme court has described the relevant considerations at the second stage as follows:

> "The second stage of postconviction review tests the legal sufficiency of the petition. Unless the petitioner's allegations are affirmatively refuted by the record, they are taken as true, and the question is whether those allegations establish or 'show' a constitutional violation. In other words, the 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief." (Emphasis omitted.) *People v. Domagala*, 2013 IL 113688, ¶ 35, 987 N.E.2d 767.

¶ 46          Additionally, to make a substantial showing of a constitutional violation, "the allegations in the petition must be supported by the record in the case or by its accompanying affidavits." *Coleman*, 183 Ill. 2d at 381. "Nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act." *Id.*; see also *Pickel v.*

*Springfield Stallions, Inc.*, 398 Ill. App. 3d 1063, 1066, 926 N.E.2d 877, 882 (2010) (" 'Well-pleaded facts' is a term that stands in contrast to 'conclusions.' ").

¶ 47    As stated, in this case, defendant's postconviction claims were all based on assertions that Jackson, his trial counsel, provided ineffective assistance. Such claims are evaluated based upon the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Dupree*, 2018 IL 122307, ¶ 44, 124 N.E.3d 908. Pursuant to *Strickland*, "a defendant must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

¶ 48                    1. *Geolocational Data*

¶ 49    In his postconviction petition, defendant alleged Jackson failed to locate and present geolocational data from his cell phone that would have shown he was not at the scene of the shooting. As to this claim, he asserted as follows:

> "Jackson was not effective in properly reviewing all available discovery in an effort
> to locate critical exonerating material. The State seized and analyzed the contents
> of the defendant's cellular phone, but Jackson failed to locate and present
> exonerating material that existed in said contents for use at trial, namely
> geolocational data that showed that the defendant was not at the scene of the
> shooting when it occurred."

¶ 50    To support his claim, defendant referenced his own affidavit, in which he alleged "Jackson had exonerating material in his possession in the form of *** digital contents from [his] cellular phone." He also attached to his petition records received by the police from his cell phone provider. Those records contained information about calls defendant received and made on the day

- 16 -

of the murder. They showed the numbers dialed, the times the calls were made, the duration of the calls, and information pertaining to each call under the categories of "NEID," "REPOLL_#," "1ST CELL," and "LAST CELL."

¶ 51 The circuit court dismissed defendant's claim, finding it was speculative and conclusory. It determined defendant failed to make a substantial showing of a constitutional violation. We agree with the court's determination and find defendant's allegations were both conclusory and unsupported.

¶ 52 In his petition, defendant made the bare assertion that geolocational data from his cell phone "showed that [he] was not at the scene of the shooting." This allegation was not supported by any specific allegations of fact and, thus, it was conclusory. Significantly, defendant made no effort to point to the precise "geolocational data" in his cell phone records to which he referred or assert how it would have established his location at any particular time. On appeal, the State accepts defendant's assertion that his cell phone records showed the cell phone towers— identified by number—that defendant's calls " 'pinged' off of." However, as the State argues, nothing in defendant's petition or supporting documentation suggests that the particular location of either defendant or his phone could be determined from such information. There is no specific factual allegation or supporting evidence to indicate that a "ping" on a particular tower at a particular time and location would indicate that defendant, or his phone, could not have been present at the scene of the shooting. Further, as the circuit court pointed out, defendant's filing did not establish that the cell phone towers themselves were "at any relevant location."

¶ 53 On appeal, defendant suggests that it was enough for him to simply allege that geolocational data showed he was not at the scene of the shooting. He contends that because that allegation was not positively rebutted by the record, it had to be taken as true at the second stage

of postconviction proceedings. However, only well-pleaded facts are to be taken as true. Defendant's assertion regarding unspecified geolocational data did not constitute a well-pleaded allegation of fact. Rather, as stated, his claim was conclusory, *i.e.*, nonfactual and nonspecific, and not properly supported by either the record or the documentation that accompanied his petition.

¶ 54 Under the circumstances presented, defendant did not make a substantial showing that Jackson provided deficient performance by failing to investigate or present geolocational data from his cell phone or that he suffered prejudice from that alleged failure. Accordingly, the circuit court committed no error in finding an evidentiary hearing was unwarranted on this issue and dismissing defendant's claim.

¶ 55 2. *Panera Text*

¶ 56 In his postconviction petition, defendant also alleged that Jackson provided ineffective assistance by failing to offer into evidence a written copy of a text message Lubamba sent to him at 6:23 p.m. on the day of the shooting, which stated "At panera." He argued the message "proved the time at which Lubamba arrived to pick up [defendant] at Panera Bread" and, thus, the text message was critical to his alibi defense. Further, he asserted that although Jackson elicited testimony at trial about the time the text was received, testimony from Detective Funkhouser that he could not tell the time zone that defendant's phone was programmed to "called th[e] evidence into question." Defendant also noted that during its deliberations, the jury sent a note asking if the time zone for the text was definitively determined. The circuit court instructed the jury that they had " 'heard testimony concerning the time frame of the defendant arriving at Panera' " and " 'must use their collective recollection in determining that testimony.' " Defendant alleged, however, that the physical copy of "[t]he text message clearly listed the time zone as being 'CDT' (Central Daylight Time)."

¶ 57        Defendant asserts that a hard copy of the text message exchange between himself and Lubamba on the day of the shooting was attached to his petition as exhibit J, and it is that document that he alleges Jackson improperly failed to admit into evidence. That exhibit indicates that the following text messages were sent to or received by defendant's phone on April 10, 2015: (1) "Naw I need to meet u" at 6:20:04 p.m., (2) "What wrong baby ?!" at 6:20:33 p.m., (3) "Where u wanna meet" at 6:22:44 p.m., (4) "At panera" at 6:23:49 p.m., (5) "Okay" at 6:24:15 p.m., (6) "Pull in now" at 6:28:55 p.m., (7) "Please be safe and stay low ! I'm really begging you , after I finish with my aunt I'm free and in for the night" at 7:01:31 p.m., (8) "Hml I love you David ! Don't do anything that will f*** you and us up please" at 8:36:39 p.m., (9) "Love u 2" at 8:38:27 p.m., (10) "I'm heading home now ! 12s hot out here by Douglas park" at 8:39:10 p.m. Each text message in exhibit J was followed by a notation of "CDT."

¶ 58        As to this second assertion of ineffectiveness by defendant, the circuit court found that the petition and its accompanying documentation failed to make a substantial showing of a constitutional violation, and it dismissed defendant's claim. We find no error in the court's decision.

¶ 59        First, as noted by the circuit court, although a written copy of the text at issue had not been introduced at trial, Jackson did elicit testimony from Detective Funkhouser about its existence. Specifically, upon questioning by Jackson, Funkhouser testified that text messages were "collected" from defendant's phone, and that they included texts exchanged between defendant and Lubamba that "described her picking him up at Panera." Additionally, although Funkhouser indicated he did not "see anything that note[d] the time zone" for the text messages that were exchanged, he stated that the "time listed" for the text at issue was 6:23 p.m.

¶ 60        Second, defendant's postconviction allegations regarding the "At panera" text are

- 19 -

both contradicted by evidence in the record and, ultimately, of little value to his purported alibi. Defendant alleges the "At panera" text was received by him from Lubamba at 6:23 p.m. local time and that it established when Lubamba arrived at Panera to pick him up. Significantly, however, at trial, Lubamba testified she picked defendant up from Panera Bread around 7:30 p.m. on the day of the shooting, and defendant himself testified that Lubamba picked him up sometime between 6:40 and 7 p.m. Further, even assuming that the text established Lubamba's arrival at Panera Bread at 6:23 p.m., the text does not similarly establish defendant's presence at that location at that time. Nor would defendant's presence at Panera Bread at that time have precluded him from being present at Oakwood Trace Apartments approximately 23 minutes earlier when the shooting occurred. As noted by the circuit court, the evidence at trial established that the shooting occurred around 6 p.m. and that the driving time between the location of the shooting and Panera Bread was 10 to 11 minutes.

¶ 61 Finally, we note that on appeal defendant argues Jackson "should have sought to admit the document labeled as [e]xhibit J" at his trial. However, the contents of that exhibit suggest strategic reasons existed for Jackson not to have sought its admission. "To satisfy the deficient performance prong of *Strickland*, a defendant *** must overcome the strong presumption that any challenged action or inaction may have been the product of sound trial strategy." *Dupree*, 2018 IL 122307, ¶ 44. Decisions regarding what evidence to present on a defendant's behalf rest with trial counsel and "have long been viewed as matters of trial strategy [citation], which are generally immune from claims of ineffective assistance of counsel." *People v. West*, 187 Ill. 2d 418, 432, 719 N.E.2d 664, 673 (1999).

¶ 62 As set forth above, exhibit J contained several additional text messages aside from the "At panera" text, which is defendant's focus on appeal. When considered together, the text

messages can be read in a way that is not supportive of defendant's theory, *i.e.*, that Lubamba arrived at Panera Bread at 6:23 p.m on the evening of the shooting. Instead of communicating Lubamba's arrival at the restaurant, the "At panera" text may simply have been confirmation of the place where Lubamba was to meet defendant. Additionally, the exhibit shows that a text message was exchanged between defendant and Lubamba approximately an hour after the murder that stated, "Please be safe and stay low ! I'm really begging you[.]" An inference that is unfavorable to defendant regarding his involvement in Carter's murder could be drawn from that text. Accordingly, a decision not to offer the document cannot be deemed unsound.

¶ 63        Defendant's postconviction petition and its supporting documentation failed to make a substantial showing that (1) Jackson's performance was deficient for not seeking the admission of exhibit J or (2) defendant was prejudiced because the exhibit was not admitted. As a result, defendant was not entitled to an evidentiary hearing on his claim and the circuit court did not err by dismissing it at the second stage of proceedings.

¶ 64                        B. Unreasonable Assistance at
                    Defendant's Third-Stage Evidentiary Hearing

¶ 65        On appeal, defendant next argues that Propps, his privately retained postconviction counsel, provided unreasonable assistance at his third-stage evidentiary hearing. He contends Propps improperly failed to (1) present any evidence at the evidentiary hearing regarding his claim that Jackson was ineffective at trial for failing to call Boykins as a witness and (2) request necessary discovery related to Joseph's police interview or seek a continuance to address the recording of that interview that was submitted by the State.

¶ 66        At the third stage of postconviction proceedings, "the defendant bears the burden of making a substantial showing of a constitutional violation." *Pendleton*, 223 Ill. 2d at 473. "[T]he court may receive 'affidavits, depositions, oral testimony, or other evidence,' to weigh the merits

of the petition and determine whether the defendant is entitled to relief." *People v. Allen*, 2015 IL 113135, ¶ 22, 32 N.E.3d 615 (quoting 725 ILCS 5/122-6 (West 2008)).

¶ 67    The sixth amendment right to counsel does not extend to postconviction petitioners and, consequently, they "have no constitutional right to counsel, effective or otherwise." *People v. Custer*, 2019 IL 123339, ¶ 30, 155 N.E.3d 374. Instead, "[p]ostconviction petitioners are entitled to only the level of assistance guaranteed by the Act." (Internal quotation marks omitted.) *Id.* That "required quantum of assistance has been judicially deemed to be a 'reasonable level,' a standard that is significantly lower than the one mandated at trial by our state and federal constitutions." *Id.* One rationale for the lower standard is that the presumption of innocence for criminal defendants "is stripped away once defendants have been convicted and pursue postconviction relief." *Id.* ¶ 31.

¶ 68    Defendants are entitled to a reasonable level of assistance at both the second and third stages of postconviction proceedings. *People v. Johnson*, 2018 IL 122227, ¶ 16, 123 N.E.3d 1083. That right is not limited to appointed counsel, and privately retained attorneys must provide the same level of representation. *Id.* Additionally, a defendant who retains a private attorney at the first stage of postconviction proceedings is also entitled to reasonable assistance at that initial postconviction stage. *Id.* ¶ 23.

¶ 69    Generally, one vehicle for ensuring that postconviction defendants receive a reasonable level of assistance is Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). *People v. Cotto*, 2016 IL 119006, ¶ 41, 51 N.E.3d 802. That rule requires postconviction counsel to show that he or she has (1) consulted with the defendant to ascertain his or her contentions of deprivation of constitutional rights, (2) examined the record of the trial proceedings, and (3) made any amendments to the defendant's *pro se* petition that are necessary for an adequate presentation of the defendant's claims. Ill. S. Ct. R. 651(c) (eff. July 1, 2017). However, "Rule 651(c) applies only

to a postconviction petition initially filed by a *pro se* defendant." *Cotto*, 2016 IL 119006, ¶ 41. Additionally, the rule does not govern postconviction counsel's performance at the third stage of proceedings. *People v. Pabello*, 2019 IL App (2d) 170867, ¶ 35, 145 N.E.3d 705.

¶ 70        "Instead, *** performance [at the third-stage] is measured by the overarching reasonableness standard generally applicable to a postconviction proceeding." *Id.* Although the *Strickland* standard for ineffective-assistance-of-counsel claims does not automatically apply when a defendant has alleged the lack of reasonable assistance in a postconviction proceeding, "the *Strickland* test is an essential standard for comparison." (Internal quotation marks omitted.) *People v. Hotwagner*, 2015 IL App (5th) 130525, ¶ 37, 40 N.E.3d 1235. In the context of a third-stage hearing, when counsel's performance passes the higher *Strickland* standard, "then it necessarily meets the lesser reasonableness standard." *Pabello*, 2019 IL App (2d) 170867, ¶ 37; see also *Hotwagner*, 2015 IL App (5th) 130525, ¶ 37 ("It *** stands to reason that if postconviction counsel's performance cannot be deemed deficient under *Strickland*, it cannot be said that counsel failed to provide the reasonable level of assistance required under the Act.").

¶ 71        Consistent with the above principles, we consider whether Propps's representation at the third-stage hearing can be deemed ineffective under *Strickland*. If her performance was acceptable under that higher standard, it also must be deemed to have been reasonable for purposes of the Act.

¶ 72                        1. *Boykins's Failure to Appear*

¶ 73        Defendant first argues that Propps provided unreasonable assistance by failing to present any evidence in connection with his claim that Jackson provided ineffective assistance of counsel at trial by not investigating or calling Boykins as a witness. He notes that claim was one of only two that were advanced for a third-stage evidentiary hearing and contends that Propps's

failure to present any evidence related to the claim resulted in it being waived. Defendant notes that Propps served Boykins with a subpoena prior to the hearing and that Boykins failed to appear. He argues Propps should have moved for a continuance to secure Boykins's appearance, filed a petition for rule to show cause as to why Boykins failed to comply with her subpoena, or asked the court to consider Boykins's affidavit. Defendant maintains he was prejudiced by Propps's unreasonable performance because, had the circuit court received evidence consistent with Boykins's affidavit, he could have been granted a new trial.

¶ 74      We disagree with defendant's contentions and find he cannot establish prejudice as a result of Propps's alleged unreasonable performance. In her affidavit, Boykins asserted she was present at Oakwood Trace Apartments during the afternoon of the shooting. She saw defendant there around 3 p.m. and observed him wearing blue latex gloves. Boykins had seen defendant wearing gloves in the past and it was her understanding that he did so because he suffered from eczema. Further, Boykins asserted defendant left the barbecue prior to the shooting and she did not see him return. She stated she was present when the shooting occurred and that defendant "was not present." Additionally, she spoke with the police following the shooting, but was never interviewed about the case by Jackson.

¶ 75      Ultimately, based upon Boykins's statements, defendant could not make a substantial showing either that (1) Jackson was deficient for failing to call Boykins as a witness or (2) defendant was prejudiced by such failure. First, Boykins's statements corroborated evidence presented by the State at defendant's trial. Specifically, Caston identified defendant as the shooter and recalled that he wore a blue latex glove when he shot Carter. Caston's observation of a blue latex glove was a key piece of identifying evidence. Testimony from Boykins that defendant was at the barbecue wearing blue latex gloves may have added weight to Caston's testimony. Thus, a

strategic reason existed for Jackson not to present Boykins as a witness. See *West*, 187 Ill. 2d at 432 (stating matters of trial strategy, including what witnesses to call and what evidence to present, are generally immune from ineffective-assistance claims).

¶ 76 Second, there is no reasonable probability that the result of defendant's trial would have been different had Boykins testified. Again, Boykins's statements about observing defendant wearing blue latex gloves prior to the shooting would have supported the State's case. Her statements suggesting defendant often wore gloves in the past because of his eczema would have been contradicted by two other witnesses, Caston and Lubamba, both of whom testified for the State that they did not ever recall defendant wearing gloves. Further, although Boykins asserted she was present when the shooting occurred and did not observe defendant at the scene, there is nothing in her statement or the record to show that she was in close proximity to the shooting, that she actually witnessed the shooting as it occurred, that she observed the shooter, or that she had any information pertaining to defendant's actual whereabouts. Finally, the record suggests Boykins and defendant shared a child, which could have been viewed as giving her a motive to provide favorable testimony for defendant.

¶ 77 Accordingly, had Propps presented Boykins's affidavit at the evidentiary hearing, or assuming that Propps was ultimately able to secure Boykins's presence and Boykins testified similarly to her affidavit, there is not a reasonable probability that that the circuit court would have granted defendant postconviction relief. Because Propps's performance cannot be deemed ineffective under *Strickland*, it also cannot be said that she failed to provide the reasonable level of assistance that the Act requires.

¶ 78 2. *Joseph's Recorded Interview*

¶ 79 Defendant also argues that Propps provided unreasonable assistance at his

evidentiary hearing with respect to his claim that Jackson was ineffective at trial for failing to investigate and present Joseph as a witness. He claims Propps failed to properly request discovery related to his claims, *i.e.*, a copy of Joseph's video-recorded interview, which prevented her from adequately preparing for the hearing. He argues that if Propps had reviewed Joseph's video-recorded statements, which were contradictory to his affidavit, with Joseph prior to the hearing, Joseph would have remembered more of his statements to the police and testified more credibly. Defendant further contends that once Propps discovered the existence of the video, "she should have requested a continuance to review it and make any necessary adjustments to her strategy."

¶ 80            "Although neither the civil nor the criminal discovery rules apply to post-conviction proceedings, a circuit court nonetheless has inherent discretionary authority to order discovery in post-conviction proceedings." *People v. Simpson*, 204 Ill. 2d 536, 548, 792 N.E.2d 265, 275 (2001). "A circuit court should allow discovery only if the moving party has demonstrated 'good cause' for the discovery request." *Id.*

¶ 81            Here, as argued by defendant, Propps could have made a discovery request in the underlying proceedings or sought a continuance based on the State's presentation of the video. Ultimately, however, the record does not reflect that her failure to take either action rendered her assistance unreasonable.

¶ 82            Initially, although Propps may have been unaware that a recording of Joseph's interview with the police existed, her questioning of Joseph at the hearing establishes that she was aware of the prior interview and the information Joseph reported. On direct examination, Propps questioned Joseph about some of that information. She also elicited testimony from him that was directed at explaining any inconsistencies in his statements, *i.e.*, that the police were accusatory toward him and he had been scared at the time of his interview. We find it speculative to suggest

that Joseph could have provided better, more credible testimony at the evidentiary hearing if Propps had reviewed the recording of his interview. Notably, on appeal, defendant offers no suggestion as to how Joseph could have "been able to more specifically explain" the inconsistencies in his versions of events if Propps had either obtained the recording earlier or sought a continuance.

¶ 83    Further, in denying defendant relief based on Joseph's testimony, the circuit court relied on several factors, including (1) the drastically different accounts of the shooting that Joseph provided, (2) his status as a convicted felon, and (3) the fact that Jackson would not have had a valid reason to call Joseph as a witness given the contents of Joseph's original statement to the police. We fail to see how any of these circumstances would have been materially altered if Propps had engaged in a more in-depth analysis of Joseph's prior police interview.

¶ 84    Ultimately, even if we are to assume that Propps's performance was deficient for the reasons alleged by defendant, he cannot demonstrate prejudice—that a reasonable probability exists that the result of his evidentiary hearing would have been different. Once again, because we find Propps's performance cannot be deemed ineffective under the *Strickland* standard, it also cannot be said that she failed to provide the reasonable level of assistance under the Act.

¶ 85                    C. Unreasonable Assistance for Failing to
            Properly Frame and Adequately Support Defendant's Claims

¶ 86    Finally, on appeal, defendant argues that Propps failed to provide reasonable assistance because she did not properly frame or adequately support all of the claims raised in his petition. Defendant contends Propps should have raised actual innocence claims, which could have been supported by the affidavits of Joseph Carter and Jason Eatman. Further, he argues Propps failed to provide adequate support for the vast majority of his remaining claims.

¶ 87    In this case, Propps was defendant's privately retained counsel. She represented

him throughout the underlying proceedings and filed his initial, and only, postconviction petition. As stated, privately retained attorneys must provide a reasonable level of assistance at the first stage of postconviction proceedings. *Johnson*, 2018 IL 122227, ¶ 23. The appropriate analysis for evaluating a claim that postconviction counsel provided unreasonable assistance at that initial stage is, again, a *Strickland* type of analysis. *People v. Zareski*, 2017 IL App (1st) 150836, ¶ 59, 84 N.E.3d 527.

> "Strictly speaking, a defendant is entitled to less from postconviction counsel than from direct appeal or trial counsel. The flip side of this principle is that it should be even more difficult for a defendant to prove that he or she received unreasonable assistance than to prove that he or she received ineffective assistance under *Strickland*." *Id.* ¶ 50.

Under *Strickland*, "a defendant must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Dupree*, 2018 IL 122307, ¶ 44.

¶ 88        Postconviction counsel can be deemed unreasonable for failing to include, or to properly allege, a nonfrivolous claim in a postconviction petition. *Johnson*, 2018 IL 122227, ¶ 24; *People v. Delgado*, 2022 IL App (2d) 210008, ¶ 32. Additionally, "[a] post-conviction petition which is not supported by affidavits or other supporting documents is generally dismissed without an evidentiary hearing unless the petitioner's allegations stand uncontradicted and are clearly supported by the record." *People v. Johnson*, 154 Ill. 2d 227, 240, 609 N.E.2d 304, 310 (1993). However, where a potential claim has no merit, the defendant cannot receive postconviction relief no matter how postconviction counsel presented it. *Zareski*, 2017 IL App (1st) 150836, ¶ 61. In

such cases, counsel's performance cannot be deemed unreasonable.

¶ 89                    1. *Failure to Present Actual Innocence Claims*

¶ 90          As indicated, defendant contends that Propps performed unreasonably by failing to frame his claims in connection with the affidavits of Joseph and Eatman as actual innocence claims. In his petition, defendant alleged Jackson was ineffective for failing to call Joseph and Eatman as witnesses at his trial. However, because the record shows Jackson could not have known about the witnesses' relevant testimony, any ineffective-assistance claim was "destined to fail." According to defendant, the claims would have succeeded under an actual innocence framework and should have been presented in that manner.

¶ 91          "To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *People v. Robinson*, 2020 IL 123849, ¶ 47, 181 N.E.3d 37. "The conclusive character of the new evidence is the most important element of an actual innocence claim." *Id.* "[T]he conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result." *Id.* "Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 48. "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.*

¶ 92          Here, we find Joseph's and Eatman's affidavits were not of such conclusive character that, when considering their statements along with the trial evidence, the result of defendant's trial would probably have been different. As set forth in our decision on direct appeal, strong evidence of defendant's guilt was presented at his trial, including "Caston's eyewitness

testimony, evidence of the blue gloves, and defendant's weak alibi." See *Beverly*, 2019 IL App (4th) 160168-U, ¶ 103. Caston—who was familiar with defendant, recognized him, and was sitting next to the victim at the time of the shooting—identified defendant as the shooter. Neither Joseph nor Eatman asserted that they were actual witnesses to the shooting. Even if their statements are taken as true, they show only that Joseph and Eatman observed men that were not defendant running (1) away from the location of the shooting (in Joseph's case) or (2) with a gun in the general area of where the shooting occurred (in Eatman's case). The record indicates the shooting occurred in a populated area. Many people were present at the barbecue and fled after the shooting occurred. Neither Joseph nor Eatman, the latter of whose statements regarding the timing and location of what he observed were vague, could identify the shooter or account for defendant's whereabouts at the time of the shooting.

¶ 93    Significantly, we also note the circuit court had the opportunity to hear and evaluate Joseph's testimony at the third-stage evidentiary hearing. The court determined Joseph was not credible and provided a thorough explanation of its decision, including that Joseph provided a drastically different version of what he observed to the police around the time of the murder. The court explicitly determined that Joseph's testimony would not have changed the outcome of the trial. This is similar to the inquiry utilized in an actual innocence claim involving the same evidence, and we can find no error in the court's ultimate determination.

¶ 94    Given these circumstances, neither Joseph's nor Eatman's affidavit was of such conclusive character that it would likely change the result upon retrial of defendant. Accordingly, defendant's actual innocence claims would not have succeeded, and Propps cannot be deemed unreasonable for failing to have raised them during postconviction proceedings.

¶ 95                    2. *Failure to Provide Adequate Support*
                           *for Defendant's Claims*

¶ 96 Defendant next argues that Propps did not provide reasonable assistance because she failed to adequately present and support the remainder of his postconviction claims, resulting in their dismissal at the second stage of proceedings. He specifically contends that Propps acted unreasonably by failing "to adequately present all of [his] claims with the necessary affidavits or other supporting documentation."

¶ 97 "In the ordinary case, a trial court ruling upon a motion to dismiss a post-conviction petition which is not supported by affidavits or other documents may reasonably presume that post-conviction counsel made a concerted effort to obtain affidavits in support of the post-conviction claims, but was unable to do so." *Johnson*, 154 Ill. 2d at 241. "Absent a showing of available material for supporting affidavits, a failure to present affidavits obviously cannot be considered a neglect by the attorney." *People v. Stovall*, 47 Ill. 2d 42, 46, 264 N.E.2d 174, 176 (1970); see also *People v. Beasley*, 2017 IL App (4th) 150291, ¶ 40, 85 N.E.3d 568 (rejecting the defendant's unreasonable assistance claim, in part, because he failed to allege what additional supporting documentation his postconviction counsel could have attached to his petition to support his claim).

¶ 98 On appeal, defendant's contentions that Propps should have presented more supporting material for his claims are vague. He largely fails to set forth what *specific* material or information Propps should have, or could have, presented. For example, in connection with his claim that Jackson was ineffective for not presenting geolocational data evidence at trial, defendant argues Propps should have provided "additional information explaining what could be determined by the fact that [his] phone pinged off the noted towers." Defendant does not set forth what "additional information" existed to support his claim. Defendant further argues that Propps should have attached or identified information from his Facebook account to support his claim that

Jackson was ineffective for failing to develop evidence regarding the relationships of the involved parties. Again, however, he does not identify any specific information from his Facebook account that Propps should have provided.

¶ 99    On appeal, defendant also argues that Propps should have obtained the affidavit of Darnell Hayes. In his petition, defendant alleged his trial counsel was ineffective for failing to call Hayes as a witness because Hayes was "present [on the scene during] the shooting," "would have exonerated" him, and was willing to testify. However, as stated, a court "may reasonably presume that post-conviction counsel made a concerted effort to obtain affidavits in support of the post-conviction claims, but was unable to do so." *Johnson*, 154 Ill. 2d at 241. Here, defendant does not point to anything in the record that warrants a different conclusion. Additionally, even in his own affidavit, defendant provided only vague information regarding the value of Hayes's potential testimony, stating simply that Hayes was present at the scene and would have exonerated him. Defendant cannot demonstrate a meritorious claim under such circumstances.

¶ 100    Because defendant's contentions regarding what evidence was available to support his claims are vague and unspecified, he cannot even arguably demonstrate the existence of a meritorious claim. Consequently, he has failed to establish that he suffered prejudice and that Propps performed unreasonably.

¶ 101    III. CONCLUSION

¶ 102    For the reasons stated, we affirm the circuit court's judgment.

¶ 103    Affirmed.