NOTICE
Decision filed 10/23/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220082-U

NO. 5-22-0082

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 15-CF-510 |
| | ) | |
| DAVID BEVERLY, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Justices Barberis and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where the defendant raised a colorable claim of actual innocence, we reverse the trial court's denial of the defendant's petition for leave to file a successive postconviction petition and remand for further proceedings. Where the defendant waived his right to be present in the courtroom at his sentencing hearing, we find that the defendant has not successfully raised plain error and we affirm the sentence. Where the record does not support the defendant's arguments that the trial court improperly considered a factor in aggravation at sentencing and/or that the sentence imposed was an improper *de facto* life sentence, we find no error supporting plain error review and affirm the sentence.

¶ 2    In April 2015, the State charged the defendant, David Beverly, with one count of first degree murder (720 ILCS 5/9-1(a)(1) (West 2014)). After a jury trial, the defendant was found guilty and was sentenced to 75 years in prison. He appealed and his conviction was affirmed, but the appellate court vacated his sentence and remanded for resentencing because the trial court had

1

relied on a void prior conviction when imposing sentence. *People v. Beverly*, 2019 IL App (4th) 160168-U. The defendant filed a petition for postconviction relief prior to resentencing. The trial court denied the petition, and the defendant appealed. While that appeal was pending, the defendant was resentenced. At resentencing, the court sentenced the defendant to a prison term of 65 years plus 3 years of mandatory supervised release. On January 17, 2022, the defendant sought leave of court to file a successive postconviction petition. The trial court denied this request. On December 27, 2022, the appellate court entered its order affirming the trial court's dismissal of some of his postconviction claims at the second stage of the proceedings, finding that he did not establish that postconviction counsel provided unreasonable assistance at the third-stage evidentiary hearing, and finding that his postconviction counsel provided reasonable assistance and adequately framed and/or supported his claims. *People v. Beverly*, 2022 IL App (4th) 210677-U.

¶ 3    On appeal, the defendant raises three issues. He argues that his request to file a successive postconviction petition should have been allowed because he raised a colorable claim of actual innocence; that he was denied his right to be present in-person for his resentencing hearing because he was the only person appearing via Zoom, and he had not knowingly and voluntarily waived his right to be present; and that the trial court erred at resentencing both by improperly considering a factor in aggravation that was already the subject of an enhancement and by imposing a *de facto* life sentence without supportive reasoning. We reverse the denial of the defendant's petition for leave to file a successive postconviction petition and remand for further proceedings. We affirm the defendant's sentence.

2

¶ 4       The facts contained herein have been largely extracted from the appellate court orders on direct appeal (*People v. Beverly*, 2019 IL App (4th) 160168-U) and in affirming the denial of his postconviction petition (*People v. Beverly*, 2022 IL App (4th) 210677-U).

¶ 5                                  I. BACKGROUND

¶ 6                        A. Pretrial, Trial, Sentencing, and Direct Appeal

¶ 7       The State charged the defendant with the murder of Arsenio Carter (Carter) who was shot and killed with a firearm. His jury trial was held in January 2016. The State presented evidence that at around 6 p.m. on April 10, 2015, police officers responded to a shooting at a barbecue at Oakwood Trace Apartments in Champaign.

¶ 8       Dreshana Caston (Caston), the victim's girlfriend, testified she witnessed the murder. On April 10, 2015, Caston attended a barbecue at Oakwood Trace Apartments with her brother, Robert Caston (Robert), and Carter, arriving at around 4 or 5 p.m. Caston drove to the barbecue in a Dodge Durango.

¶ 9       When they arrived at the barbecue, they sat in Caston's vehicle talking for about 10 minutes. Caston testified that she recognized several of the individuals in attendance. Her uncle, Christopher Hugger, came up to her vehicle to say hello. Caston subsequently left the barbecue for about 5 or 10 minutes with her brother and Carter, going to her grandmother's house.

¶ 10      Caston testified that they returned to the barbecue. She was in the driver's seat, Carter was seated in the front passenger seat, and Robert was seated in the back. Caston parked in a lot located near Third Street and Burr Oak Court in the vicinity of Oakwood Trace Apartments.

¶ 11      When they returned to the barbecue, Caston saw her ex-boyfriend, Joseph Carter, the defendant, and Matt Carter. Caston stated "[t]he first time [she saw the defendant], he was in the group talking" and then he "came around [a] truck." Caston could see the defendant's face and

3

recognized his tattoos as well as his dreadlocks. She further explained that when she initially saw the defendant, he was wearing a black hoodie with the "hood on" but it "wasn't [drawn] tight and [the defendant's] dreads [were] out."

¶ 12   When asked how "sure [she was] of [her] identification" of the defendant at that time, Caston stated she was "pretty sure." Caston explained she knew the defendant and she had seen him on about five prior occasions when he was "out" and "going into clubs and stuff like that." Caston stated that the defendant had also been to her house for a "get-together."

¶ 13   Caston further testified that when she pulled into the parking lot she also saw Deveonta Lindsey (Lindsey), an individual she knew from the "neighborhood" and school. During the barbecue, Lindsey "pulled [Caston's] brother to the side, talked to [her brother], and then after [Lindsey] [was] done talking to him, [Lindsey] was standing in the back of [Caston's] [vehicle]." Caston testified that she "didn't really hear what [Lindsey] was talking about." Caston "got out of [her] car to try to [hear], but [her] brother was getting back in [her] car by then."

¶ 14   Caston testified she was "very worried" when she got back inside her car because, in her side-view mirror, she saw Lindsey with a black hoodie that he pulled tight as he stared—"mean mugging"—which meant that Lindsey was "looking at [Caston's] car" with a "mean face" as though he had "a problem or something." Caston further testified that Lindsey "[j]ust stood there" toward the "back of [Caston's] car" on the "driver's side." According to Caston, Robert said, "Man, I don't know what's going on." Carter, who was sitting in the front passenger seat smoking a cigarette with his window rolled down, replied, "Yeah, we need to get ready to go."

¶ 15   Caston testified that the defendant then walked up to Caston's car. When asked how certain she was of the defendant's identity as he approached, Caston responded, "It was David." She further stated, "Yes," it was "[t]he [d]efendant, Mr. Beverly." Caston explained that she could see

4

the defendant's tattoos, face, and hair. She further explained that it was light outside and she could see "a blue glove on [the defendant's] hand" as he approached her car. Caston stated, "[W]hy would [the defendant] just be walking around with a blue glove on his hand unless he's going to do something to somebody[?]" When shown a picture of the blue glove depicted in the State's exhibit number 7, Caston identified the glove in the picture as the same glove she saw the defendant wearing at the time of the shooting.

¶ 16     As Caston attempted to back her car out of the parking space, the defendant pulled out a short black gun. As she was trying to drive away, the defendant "shot in [Caston's] car at Arsenio [Carter] and shot him in the chest." The defendant was standing about three feet away from Caston's car at the time. When Caston heard the gunshot, she "sped off."

¶ 17     Caston drove Carter to the hospital for medical treatment. Blood was coming out of his chest as she was driving. By the time they arrived at the hospital, Carter was unable to speak as he gasped for air. Carter subsequently died at the hospital that day.

¶ 18     At the hospital, police officers spoke to Caston about the shooter's identity. Caston testified that she "pulled up" the defendant's Facebook photo on her cell phone. Caston testified she knew the defendant by the nickname "Glocc" and his Facebook name was "Glocc Murdablock Krazi."

¶ 19     On cross-examination, Caston stated she "didn't see [the defendant]" when she first arrived at the barbecue. However, after visiting her grandmother's house and returning to the barbecue, Caston saw the defendant in a white truck with her ex-boyfriend, Joseph Carter, and Matt Carter.

¶ 20     Caston testified that when police officers questioned her at the hospital, she told them the shooter was wearing light jeans. Caston later spoke to Detective Patrick Funkhouser at the police department about the shooting. Detective Funkhouser showed Caston a picture of the defendant,

and Caston responded, "that was him." Caston testified that the picture she was shown was a "mug shot."

¶ 21    On redirect examination, Caston testified that at the time of the shooting, she saw a blue glove "hanging out of [the defendant's] pocket." She explained that the defendant pulled the glove from his pocket and then held the gun with the glove when he shot Carter.

¶ 22    Champaign police officer Justus Clinton testified he was on duty at 6 p.m. on April 10, 2015, when he received a report of shots fired near "Fourth and Beardsley [Avenue]." He stated the parking lot where the shooting occurred was west of Oakwood Trace Apartments. Another police officer, Arthur Miller, stated he located "a single spent shell casing" in the parking lot.

¶ 23    Dr. Shiping Bao testified that he performed an autopsy on Carter. Dr. Bao stated the cause of death was a gunshot wound to the chest.

¶ 24    Champaign police officer Thomas Petrilli testified he went to the hospital after the shooting. He secured Caston's car and observed "blood on the passenger *** side step board" and the "center console area of the vehicle." Officer Petrilli also testified that while at the hospital, he spoke to Caston, who was "flustered" and "pacing back and forth." She seemed "pretty worked up at the time." Caston showed officers a picture of the defendant on her phone.

¶ 25    Detective Dustin Sumption testified he was asked to assist with investigating the defendant's Facebook information. Detective Sumption received a picture of the defendant's Facebook profile. He testified that State's exhibit number 5 depicted "a snapshot" of a Facebook profile picture, beneath which was the name "Glocc Murdablock Krazi." Detective Sumption testified that the Facebook profile picture depicted the defendant "wearing a black Adidas coat and a black stocking cap."

¶ 26    Detective Sumption testified that during his investigation, he obtained photographs of the defendant from the Illinois Secretary of State that included the defendant's "driver's license photograph as well as an Illinois Department of Corrections photograph." Detective Sumption explained he was able to compare those photographs to the defendant's Facebook profile picture that Caston had shown officers at the hospital. Detective Sumption testified he was able to identify the defendant as the individual in the Facebook profile picture Caston had showed to officers the day of the shooting.

¶ 27    Cynthia Lubamba (Lubamba) testified next. She began dating the defendant after they met in February 2015. She identified the defendant in court. Lubamba testified that the defendant was "close friends" with Kytiece "Boosie" Frazier who had been shot in April 2015, and the defendant was "upset" about Frazier having been shot.

¶ 28    Lubamba stated she told the defendant she could not attend the April 10 barbecue. Around 6 p.m. on the night of the barbecue, the defendant "kept calling" her. When she finally answered the phone, the defendant asked her for "a ride." The defendant initially asked to come over to Lubamba's home, but she told him she was busy. The defendant then asked Lubamba for a ride to a "friend's house" instead. Lubamba testified she picked the defendant up at the Panera Bread restaurant (Panera) in Champaign "around 7:00 or 8:00" p.m. that day.

¶ 29    Lubamba testified that when she arrived, the defendant was inside Panera. Lubamba texted the defendant that she was outside. After driving the defendant from Panera to Brookstone Court, Lubamba went to her aunt's house.

¶ 30    Lubamba next heard from the defendant later that night when the defendant asked about a hat he left in her car. Lubamba dropped off the defendant's hat and went home. When she arrived at her home, police officers pulled in behind her vehicle. They asked her to contact them the next

7

time she saw the defendant. Later that night, around 11 p.m., the defendant called and asked Lubamba to pick him up.

¶ 31    In the early morning hours on April 11, 2015, Lubamba picked the defendant up from Brookstone Court. Lubamba testified the defendant sat in the backseat of Lubamba's vehicle even though nothing was in her front passenger seat preventing him from sitting there. She explained that the windows in the back of her vehicle were tinted. As they drove, a black truck followed behind them. Lubamba asked the defendant what was going on, but he "didn't say much." The defendant "just wanted cigarettes." When they arrived at a gas station, Lubamba exited the vehicle and police officers subsequently arrested the defendant.

¶ 32    Champaign police officer Benjamin Newell testified that he was present for the defendant's arrest on April 11, 2015, and stated no weapons were found on the defendant at that time.

¶ 33    Brandy Coakley, Carter's sister, testified she frequently saw Carter and his best friend, Tarrell "Rat" Boatman, together. They were "like brothers."

¶ 34    Champaign police officer Jim Bednarz testified he executed a search warrant on April 13, 2015, at "1302 Brookstone, [a]partment 102." He testified to photographs depicting two hooded sweatshirts found in an upstairs bedroom of the apartment. Another photograph showed a small purse hanging in a closet in the same upstairs bedroom. In the purse, he found a plastic bag containing 9-millimeter bullets and casings in addition to a .40-caliber bullet. Officer Bednarz testified he did not find "anything that put [the defendant] in that apartment."

¶ 35    Detective Patrick Simons testified that he was an expert in cellular forensics. He explained he performed an analysis of the defendant's cell phone. Detective Simons testified the defendant's cell phone number was linked to his Facebook account. Detective Simons located a Facebook post

8

originating from the defendant's cell phone on the day of the murder at approximately 11:10 a.m., which stated: "I put it on my soul *** u ain't goin b da only one wit a headstone my nigga."

¶ 36 Detective Funkhouser testified next and explained he was primarily responsible for the investigation of Carter's murder. He had also investigated a case in which Tarrell Boatman pled guilty to shooting Kytiece Frazier on April 8, 2015. Detective Funkhouser testified he obtained and reviewed video surveillance footage from Carle Hospital where Frazier was recovering from his gunshot wounds.

¶ 37 Detective Funkhouser testified he made screenshots of still images from the video surveillance footage at Carle Hospital that depicted the defendant inside the hospital at around 11 a.m. on April 10, 2015. He stated that two still images of the defendant at Carle Hospital depicted the defendant with a cell phone in his hand at 11:19 a.m. Detective Funkhouser testified that in the Carle Hospital surveillance video, the defendant was wearing a "flat-billed ball cap" with a "black zippered hoodie" and "frosted" camouflage pants. He testified the defendant's clothing in the surveillance video "appears to be the same exact clothing that [the defendant] was wearing when he was taken into custody with the exception of the fact that when he was taken into custody, [the defendant] was not wearing a black hoodie."

¶ 38 Detective Funkhouser testified that in Frazier's hospital room, there were dispensers mounted on the wall containing blue latex gloves. He explained that when the defendant was searched following his arrest, two blue gloves were found in his right front pants pocket that "appeared to be identical" to the blue gloves in Frazier's hospital room. Detective Funkhouser acknowledged that the gloves found in the defendant's pocket were tested and no gunshot residue was found.

¶ 39    Detective Funkhouser obtained video surveillance footage from the day of the murder from the Walmart Supercenter (Walmart) located at 2610 North Prospect Avenue in Champaign. He testified that the footage showed the defendant was at Walmart with his girlfriend, Wendy Driver. Detective Funkhouser testified the surveillance footage showed the defendant entering the Walmart at around 4:38 p.m. and exiting at 4:44 p.m. He stated that the shooting occurred around 6 p.m. and was reported at around 6:03 p.m. on April 10, 2015.

¶ 40    Detective Funkhouser testified he found a text message on the defendant's cell phone "between [the defendant] and Cynthia Lubamba that described [Lubamba] picking [the defendant] up at Panera" on the day of the shooting. He testified the "time listed" on the "Panera text" was 6:23 p.m. He also stated that the "driving time" between Panera and where the shooting occurred at Oakwood Trace Apartments was approximately 10 to 11 minutes.

¶ 41    Detective Funkhouser, along with Sergeant Dennis Baltzell, interviewed the victim's girlfriend, Caston, after the shooting on April 10, 2015. During the first recorded interview with Caston, she stated that before the shooting at the barbecue, "she saw her brother get out of [her] vehicle and speak with Deveonta Lindsey right outside [Caston's] vehicle." When asked whether Caston told Detective Funkhouser if she had overheard her brother and Lindsey discussing another murder that occurred in 2014 involving Rakim Vineyard, Detective Funkhouser responded that he believed Caston "mentioned the Rakim Vineyard murder in relation to the conversation" between her brother and Lindsey. Detective Funkhouser testified that Caston told him two groups of individuals at the barbecue had an "ongoing dispute with Arsenio [Carter] and [Carter's] friends over the murder of Rakim Vineyard." Detective Funkhouser acknowledged that Caston was "very upset" and crying during the initial interview, which took place shortly after the murder.

10

¶ 42     With respect to the bullet recovered from Carter's body, Detective Funkhouser testified it was a 9-millimeter bullet. Detective Funkhouser further testified that Landriana Walker, one of Lindsey's girlfriends, lived in apartment 102 located at 1302 Brookstone Court, which was located "right in [the] area where the [d]efendant was picked up by Cynthia Lubamba" on the day of his arrest.

¶ 43     The parties entered several evidentiary stipulations. Specifically, they stipulated that (1) deoxyribonucleic acid (DNA) collected from the defendant was compared to DNA from the black hooded sweatshirts found in the Brookstone Court apartment, and the comparison was deemed inconclusive; (2) the 9-millimeter cartridge casing recovered from the scene was tested for latent fingerprints, but none were found; (3) no gunshot residue was detected on the latex gloves found in defendant's pocket after his arrest or on the black hooded sweatshirts found in the Brookstone Court apartment; and (4) gunshot residue might not be detectible for several reasons and the absence of gunshot residue on a person did not mean that the person had not discharged a firearm.

¶ 44     The State rested, and the trial court denied the defendant's motion for a directed verdict.

¶ 45     The defendant presented the testimony of Champaign police officer Edward Sebestik, who testified that he went to the hospital after Carter was shot. Upon arrival at the emergency room, there was "a little bit of chaos" and Caston was "covered in a large amount of blood." Caston was "pacing back and forth" and both Caston and her brother "appeared to be in hysterics after having just experienced a pretty traumatic incident firsthand."

¶ 46     Officer Sebestik acknowledged that he wrote in his report that Caston was "initially uncooperative." However, Officer Sebestik testified he believed Caston was "as cooperative as she could be given the circumstances."

11

¶ 47    When Officer Sebestik asked Caston if she had any information about the shooter, "[s]he did not verbally respond" and she "pulled out her cell phone and went to her Facebook page" to show Officer Sebestik "a photo of an individual." Officer Sebestik asked Caston if "that was who had *** shot her boyfriend Arsenio [Carter], [and] she said [']yes.[']" Officer Sebestik testified that Caston "again bec[a]me uncooperative [after] further question[ing]," she "lock[ed] her phone," and Officer Petrilli persuaded Caston to unlock her phone again. He subsequently took Caston to his squad car to have a "one-on-one" conversation.

¶ 48    According to Officer Sebestik, during Caston's recorded interview, Caston described the shooter as wearing a black hooded sweatshirt and black jeans and had medium length dreadlocks. Caston also told Officer Sebestik that the shooter was "wearing a rubber hospital glove" and had "a tattoo." Caston was "not sure what the tattoo was of but *** she was sure that it was on [the shooter's] face."

¶ 49    Wendy Driver (Driver) testified next. She stated that in April 2015, she lived at 1301 North Brookstone Court, apartment 104. She testified she was the defendant's friend.

¶ 50    Driver testified to the timeline of events on April 10, 2015. Driver explained she dropped the defendant off at Carle Hospital that morning. Later that day, Driver called the defendant and asked if he would go to Walmart with her "to buy a shirt."

¶ 51    At around 4 p.m. on April 10, 2015, Driver picked the defendant up from the barbecue at Oakwood Trace Apartments. They went "directly" to a Walmart located in Champaign. After purchasing a shirt at Walmart, Driver and the defendant went back to her house where they "hung out" for "a little while" before the defendant left.

¶ 52    According to Driver, approximately 10 or 20 minutes after leaving her apartment, the defendant called and asked Driver to drive him to the Panera. Driver dressed her children and met

the defendant at her apartment complex. The defendant was already there waiting for her outside. They proceeded to Panera, and when they arrived, Driver and the defendant "sat there for a while" in Driver's vehicle. The defendant told Driver "he was waiting on a ride." They talked for "a little bit" and then the defendant got out of Driver's car. Driver returned to her apartment because she had to work later that evening. Driver admitted she "[didn't] really remember any of the times."

¶ 53    On cross-examination, Driver testified that the defendant called her after he was arrested and in custody. Driver stated, "When I first spoke to [the defendant], I asked him *** [']how are you accused of the killing when you was with me? We went to Walmart. Wasn't that the time we went to Walmart?[']" Driver acknowledged she did not know what time the shooting occurred. When asked about what she told Detective Funkhouser, Driver testified she "didn't know what time [she] was there" at Walmart and she did not think that she "gave [him] a time." Driver also admitted that, when she spoke to Detective Funkhouser, she did not know at what time she drove the defendant to Panera.

¶ 54    Driver testified that "the sun was setting and it was shining in [her] eyes as [she] [was] driving" the defendant to Panera. Driver explained she "specifically remember[ed] that because [her] glasses [were] broke and [she] could barely see."

¶ 55    Sergeant Baltzell testified that he investigated the shooting on April 10, 2015. That evening, he and Detective Funkhouser interviewed Caston. Sergeant Baltzell wrote a report summarizing the interview. When asked about the first time Caston saw the defendant on the day of the shooting, Sergeant Baltzell testified that the way "[s]he phrased it[,] [Caston] didn't see [the defendant] prior to [the defendant] walking up to the car with a latex glove on." Sergeant Baltzell explained that "from the very beginning" Caston was "very clear about who did it."

13

¶ 56    The defendant testified on his own behalf. He met Caston in March 2015 at a small party. The defendant next saw Caston at a barbecue on his birthday several days later. The defendant testified that Carter was not at either of these events in March 2015. The defendant denied ever meeting Carter. He denied shooting Carter or "even [being] in the vicinity of where this took place."

¶ 57    The defendant testified that on the morning of April 10, 2015, Driver took the defendant to visit Kytiece Frazier at Carle Hospital. Afterwards, the defendant went to an apartment complex and saw Tiwanda Winkins, who was pregnant with the defendant's child. Winkins and Driver lived in the same apartment complex. The defendant visited Winkins for about an hour and then left for the barbecue at Oakwood Trace Apartments.

¶ 58    At the barbecue, the defendant had a disagreement with David Dalton, "the guy *** who the barbecue was for." The defendant testified that he "really had words" with Dalton "so [the defendant] left." The defendant testified that he did not return to the barbecue.

¶ 59    Driver picked the defendant up from the barbecue at about 4 p.m. and asked him to go to Walmart. When they left Walmart, they drove back to Driver's apartment and the defendant stayed there for "[p]robably like 30, 45 minutes."

¶ 60    The defendant testified that he left Driver's apartment and went to the home of "Iresha," Kytiece Frazier's "auntie," who lived on Beslin Street. The defendant explained that he went to Iresha's home because he wanted her to "drop [the defendant] off on Kirby [Street]." The defendant testified that Iresha "had her *** kids so she wouldn't" drive him there. The defendant explained "that's why [he] had to call Wendy [Driver]" and asked for a ride to "Kirby [Street]."

¶ 61    The defendant testified he walked from Beslin Street to Driver's apartment complex. He asked Driver to take him to Kirby Street because the defendant was "going to meet another girl."

14

The defendant explained Driver took him to "Panera Bread right along Kirby and Mattis in the plaza."

¶ 62   According to the defendant, he arrived at Panera with Driver at "6 something." The defendant testified that the "sun [was] setting" at "the time [he] [was] on [his] way there [to Panera Bread]." As they drove to Panera, it was "still light" outside. The defendant explained the sun "was setting" but it "wasn't set" yet. Upon arrival, the defendant and Driver stayed at Panera for "probably like ten or [fifteen] minutes" and talked.

¶ 63   The defendant testified that Lubamba subsequently picked him up from Panera Bread at "probably like 6:40, 6:50." The defendant stated that it was "getting dark" but it still "wasn't dark." He later testified that Lubamba picked him up from Panera "around 7:00."

¶ 64   The defendant stated Lubamba contacted him later about his hat he had left in Lubamba's vehicle. Lubamba brought the defendant his hat and "left again."

¶ 65   The next time the defendant saw Lubamba was the day of the defendant's arrest. The defendant testified that Lubamba met him at "Hamilton [apartments] [at Brookstone Court] and she drove *** to the gas station *** [where] [the defendant] [was] apprehended by the police." The defendant testified that he sat in the backseat of Lubamba's vehicle because he was "intoxicated." The defendant further explained that Lubamba was "acting real funny" so the defendant sat in the backseat "in case something happened" and the defendant was "going to jump out."

¶ 66   The defendant testified that after he was arrested, blue latex gloves were found in his pocket. He took two gloves from "the hospital when [he] was there earlier." The defendant explained that he took the latex gloves because he has eczema on his hands. He "usually" wears gloves such as "baseball gloves" "especially if [he is] going somewhere." He testified that he wears

15

gloves "a lot." The defendant explained that "people who know [him]" "don't see [him] actually with hospital gloves, but they [have] seen [the defendant] with baseball gloves a lot." He chose to take hospital gloves from Frazier's hospital room because he "didn't have any gloves" that day so he "just grabbed some." The defendant testified that it was a "normal practice" for him to do this. The defendant further stated, "Like every time I'm at the hospital, like my baby mama or any one of my friends, they'll tell you every time I go like I grab some gloves. Like the girl I used to go with, she was pregnant. I grabbed some gloves."

¶ 67    The defendant testified that he took the blue gloves from Frazier's hospital room "close in time" to when he posted the following on Facebook: "I put it on my soul *** u ain't goin b da only one wit a headstone my nigga." He explained that he posted it "from [his] phone" when he was visiting Kytiece Frazier at the hospital at around 11:20 a.m. on April 10, 2015. The defendant further explained the name beneath his Facebook picture, "Glocc Murdablock Krazi," referred to him.

¶ 68    The defendant denied the Facebook post was intended to be a threat or an "expression of being upset about Kytiece Frazier." The defendant explained it was "actually [Frazier's] favorite song." The defendant further explained that, "since [Frazier] was hurt, [the defendant] just wanted to post something for him." He stated the song in the Facebook post was about "shooting people based on other people having been shot." The defendant testified that the song was "[n]ot really [about] revenge." But he acknowledged "[i]t's a violent song." The defendant also acknowledged that when he posted it to Facebook, he knew Frazier had been shot two days earlier. But the defendant "didn't know [Tarrell Boatman] was in custody yet" for shooting Frazier.

16

¶ 69    Prior to the defense resting, the court read the following stipulation to the jury: "the Court has taken judicial not[ic]e of the fact that on April 10 of 2015 in Champaign, Illinois, Central Daylight Time, sunset was at 7:26 p.m."

¶ 70    The State then presented Caston as a rebuttal witness. On rebuttal, Caston testified that on the occasions she saw the defendant in March 2015, "[h]e never had on any gloves." Caston stated she only saw him wearing gloves on April 10, 2015.

¶ 71    Caston further testified that her uncle, Christopher Hugger, sent her a text after the shooting. He texted "words to the effect of [']sorry, that wasn't supposed to happen.[']" Caston testified, "I don't know what [Hugger] meant by that." When asked whether it could have been Hugger who shot Carter, Caston responded, "The face I seen plays in my head every day, and it is [the defendant's] face." She further explained that Hugger had no tattoos on his face but he did have a "RIP Rakim" tattoo on his neck. She testified that there was no "possibility that [she] could mistake [her] uncle for the [d]efendant."

¶ 72    The State also presented Lubamba as a rebuttal witness. Lubamba testified she did not recall the defendant "ever wearing gloves" when they dated from February 2015 until the beginning of April 2015. She also could not remember the defendant wearing baseball gloves. When asked how many times she saw the defendant wearing "blue plastic gloves," Lubamba responded, "Not at all." Lubamba clarified that on April 10, 2015, the day of the shooting, she picked the defendant up from Panera "around 7:30" that evening.

¶ 73    Detective Funkhouser testified next as a rebuttal witness. Detective Funkhouser testified he spoke with Driver on April 13, 2015, to discuss the defendant's whereabouts on the day of the shooting. Detective Funkhouser testified Driver told him she was at Walmart with the defendant "[b]etween 5:00 p.m. and 7:00 p.m." on April 10, 2015. Detective Funkhouser explained this was

17

important to his investigation because it encompassed the time that included the murder. Detective Funkhouser testified that by the time he spoke with Driver on April 13, 2015, she had already spoken with the defendant following his arrest. When Detective Funkhouser first spoke with Driver, she did not mention going to Panera with the defendant. She only said that after going to Walmart "[Driver] drove [the defendant] back to her residence, and within a very short amount of time [the defendant] received a text message and he left." Driver told Detective Funkhouser that she "never saw [the defendant] again."

¶ 74    The second time Detective Funkhouser spoke with Driver, she said that on the day the shooting occurred, "she gave [the defendant] a ride to West Kirby Avenue in Champaign" where the Panera was located.

¶ 75    The third time Detective Funkhouser spoke to Driver, she told him, "I can't even say that [the defendant] and I were together a whole hour that day." Detective Funkhouser testified that, during this interview, Driver never mentioned going to Panera with the defendant. He also stated that the approximate "driving time" between Panera and Oakwood Trace Apartments where the shooting occurred was "ten to eleven minutes."

¶ 76    The defendant, in surrebuttal, testified Lubamba would not have seen him wearing gloves when they dated because he only wore gloves when he was outdoors "around, like, grass or dirt" and he generally spent time with Lubamba "late at night[,] [when] [the defendant] needed a ride[,] or [when they would] get a hotel room." The defendant testified that he "normally" wears "baseball gloves." He further explained that the "only reason" he had the hospital gloves on April 10, 2015, "was because [he] was at a hospital."

¶ 77    In closing argument, the State asserted that the defendant shot and killed Carter on April 10, 2015. The State argued that Carter's friend, Tarrell Boatman, shot the defendant's friend,

18

Kytiece Frazier, on April 8, 2015, and that Carter's murder was "retribution for the shooting of Kytiece Frazier."

¶ 78     With respect to the sequence of events, the State stressed that on the morning of the shooting, the defendant was at the hospital visiting Kytiece Frazier when the defendant "ma[de] this post, 'Put it on my soul, you ain't goin' be the only one with a headstone.' " The State argued that this was a "window" into "what's going on inside the [d]efendant's head, he wrote down what he was thinking." The State noted the defendant took blue gloves from the hospital room when he was writing the Facebook post. "[C]learly he's intending that there be more than one headstone, and that's why he takes the gloves."

¶ 79     The State asserted that after leaving the hospital, the defendant "h[ung] out with friends" before going to the barbecue at Oakwood Trace Apartments where he "sees [Carter,] the guy who is best friends *** with the fellow who shot [the defendant's] own friend." The State argued that the defendant "puts on that glove, takes that gun out, points it through the window at Arsenio Carter[,] and [the defendant] shoots him [around 6 p.m.]." The State noted Detective Funkhouser's testimony, stating it is a 10-minute drive from the area of Oakwood Trace Apartments to Panera. At the time of the defendant's arrest, "[t]he biggest coincidence" occurs where he "just happens to have those gloves in his pocket."

¶ 80     Defense counsel argued the lyrics in the defendant's Facebook post referencing a "headstone" lacked relevance because Kytiece Frazier was "alive" and "didn't have a headstone." Further, no one else at the barbecue identified the defendant as the shooter, the physical evidence could not be connected to the defendant's DNA, the State's case "rest[ed] solely" on Caston's testimony that "significantly" differed from what she initially told officers, and Caston was only "pretty sure" the defendant was the shooter.

19

¶ 81    As for the sequence of events on April 10, 2015, defense counsel asserted that the defendant was not present when the shooting occurred, noting the defendant and Driver arrived at Walmart at 4:38 p.m. and left at about 4:44 p.m. before returning to Driver's residence around 5 p.m. and staying there for about 30 minutes. The defendant left Driver's apartment "briefly" and thereafter met Driver and her children in the parking lot of Driver's apartment complex, at which time they drove to Panera. After they arrived at Panera, the defendant and Driver "stay[ed] there for a few minutes talking." Defense counsel then noted Lubamba sent the defendant a text message at "6:2[3] p.m." describing Lubamba picking the defendant up at Panera, and thus establishing the defendant "wasn't at the barbecue" when the shooting occurred.

¶ 82    Following deliberations, the jury found the defendant guilty of first degree murder.

¶ 83    On March 3, 2016, defense counsel filed a motion for a new trial, which the trial court denied. The court conducted the defendant's sentencing hearing that same day. The court stated the defendant's criminal history was "extensive" and noted the recency of his "last conviction out of Cook County *** for aggravated unlawful use of a weapon" in May 2013. The court then sentenced the defendant to 75 years in prison.

¶ 84    The defendant's conviction was affirmed on direct appeal, but his sentence was vacated. *People v. Beverly*, 2019 IL App (4th) 160168-U.

¶ 85                              B. Postconviction Petition and Appeal

¶ 86    In April 2021, the defendant filed a postconviction petition with the assistance of privately retained counsel. He raised numerous allegations that his trial attorney provided ineffective assistance. His petition included allegations that, prior to trial, his attorney improperly failed to (1) communicate with the defendant, show the defendant discovery in the case, or discuss with the defendant the State's evidence; (2) review available discovery and locate geolocational data from

20

the defendant's cell phone that would have established the defendant was not present at the scene of the shooting when it occurred; (3) locate and interview occurrence witnesses Joseph Carter (Joseph), Jason Eatman (Eatman), Darnell Hayes, and Tolanda Boykins (Boykins); (4) speak with and prepare Driver, the defendant's alibi witness, to testify; (5) interview Caston or properly prepare for Caston's testimony; (6) interview Lubamba; (7) prepare the defendant to testify; (8) discuss stipulations in the case with the defendant; and (9) file motions *in limine* to exclude evidence.

¶ 87    The defendant also alleged several ways in which his trial attorney allegedly provided ineffective assistance during his jury trial. Specifically, in his petition, he asserted his trial attorney failed to effectively develop the defendant's alibi defense by not (1) eliciting testimony from Driver regarding the route she took when driving the defendant to Panera, (2) objecting to testimony about the approximate drive time from the scene of the shooting to Panera, and (3) seeking to admit a written copy of the text message Lubamba sent to the defendant that "proved the time at which Lubamba arrived to pick up *** defendant at Panera." The defendant also alleged that his attorney failed to call occurrence witnesses on his behalf, including Joseph, Eatman, and Boykins. He asserted that his attorney improperly failed to object to certain testimony; entered stipulations that were detrimental to his defense; failed to admit "key pieces of evidence," including clothing he wore on the day of the offense; "failed to develop the relationships between the individuals allegedly involved or the lack thereof"; and failed to elicit testimony from Caston that would have damaged her credibility.

¶ 88    Finally, in his postconviction petition, the defendant alleged that his trial attorney was ineffective after his trial for failing to file a "complete" posttrial motion. He also alleged his appellate counsel on direct appeal was ineffective for failing to raise any of the claims set forth in

21

his petition. The defendant attached various documents to his petition, including his own affidavit; the affidavits of Joseph, Eatman, and Boykins; police reports; cell phone records, including a transcript of text messages purportedly exchanged between himself and Lubamba; transcripts from the underlying trial proceedings; and the motion for a new trial filed by his attorney.

¶ 89 In his affidavit, Joseph asserted that he was present at Oakwood Trace Apartments on the day of the shooting. He was familiar with the defendant, but "would not say that [the two] were friends." Joseph maintained he "was in the area when the shooting occurred" but "did not see [the defendant] there at the time." When the shooting happened, Joseph looked in the direction of where the shots were fired and could see "a male running away from" Caston's vehicle. He thought that person was the shooter and stated the man he saw "was definitely not" the defendant. Joseph further maintained that he spoke with the police about the incident, but the defendant's trial attorney never tried to contact or interview him. He would have been willing to testify on the defendant's behalf if he had been asked.

¶ 90 In her affidavit, Boykins asserted she was also present at Oakwood Trace Apartments around the time of the shooting. She was familiar with the defendant and observed him at the barbecue around 3 p.m. When she saw the defendant, he was wearing blue latex gloves. Boykins averred that she had seen the defendant wearing gloves in the past and it was her understanding that he did so "due to excema [sic]." Boykins asserted that the defendant left the barbecue about an hour after she arrived, and she did not see him return to the area. Further, Boykins stated she "was in the area when the shooting occurred later and [she] did not see [the defendant] there." According to Boykins, the defendant "was not present" when Carter was shot. Additionally, she maintained that she spoke with the police after the shooting. Although she was willing to testify on the defendant's behalf, the defendant's trial attorney never interviewed her about the case.

¶ 91    Finally, Eatman averred that between 6 or 7 p.m. on the day of the shooting, he went to Oakwood Trace Apartments to meet a friend who lived at that location. While there, he observed "a light[-]skinned male with short dread locks, with a face full of tattoos, run pas[t] [him]." The man had a gun that "he was tryin[g] to put back in his hoody," and he was running with another individual, who was "light[-]skinned" and had gold teeth. According to Eatman, neither individual was the defendant, who Eatman knew "from around Champaign." Although Eatman later learned someone was killed in the area and that the defendant was arrested for the crime, he did not report what he had seen to the police because he did not want the police bothering him. It was not until Eatman and the defendant ended up "in the same prison" that Eatman reached out to the defendant.

¶ 92    The trial court advanced the defendant's postconviction petition to the second stage of postconviction proceedings. In June 2021, the State filed a motion to dismiss the defendant's petition, and in July 2021, the defendant filed a reply to the State's motion.

¶ 93    In August 2021, the circuit court entered a lengthy written order in which it granted in part and denied in part the State's motion to dismiss. The court dismissed the vast majority of the defendant's claims, finding his petition and accompanying documentation failed to make a substantial showing of a constitutional violation. The court found those claims were either rebutted by the record or "vague, conclusory[,] or speculative." Additionally, it stated that many of the defendant's claims lacked "specificity to show that counsel's actions were inappropriate or that the outcome of the proceeding would have been different."

¶ 94    The circuit court advanced two of the defendant's claims for a third-stage evidentiary hearing. Specifically, it determined the defendant made a substantial showing of a constitutional violation with respect to his claims that his trial attorney was ineffective for failing to locate, interview, and present testimony from Joseph and Boykins.

23

¶ 95    In November 2021, the circuit court conducted a hearing in the matter. At the outset of the hearing, the defendant's postconviction counsel informed the court that Boykins was not present for the hearing, although she had been served with a subpoena. She asked that the court hear testimony from Joseph, who was present from the Illinois Department of Corrections, and then grant the defendant a continuance "to try to secure *** Boykins'[s] appearance" in court. The State objected, arguing the case had "been set for a great deal of time" and that it also had witnesses who were present. The court elected to proceed with the hearing and revisit the issue of a continuance after hearing testimony from other witnesses. Ultimately, the record shows that postconviction counsel decided not to seek a continuance based on Boykins's absence.

¶ 96    At the hearing, Joseph testified that on April 10, 2015, he was present for the barbecue at Oakwood Trace Apartments. At that time, he had seen the defendant around, but he did not know exactly who the defendant was. Joseph recalled the shooting and testified that when he "heard the shots" he "ducked" but then "got up to look around and see what was going on." He did not know how far away he was from the location of the shooting, stating, "I really wouldn't know the distance, but I was fairly, like, I guess you would say in the middle kind of far. I wasn't far away, but I was there." Joseph looked in the direction of where the shots had been fired and saw "a truck pulling off" and "a male running the opposite way of everybody else." Joseph believed the person he saw running was the shooter because the person was running in a different direction than others at the scene. The person he saw running was not the defendant.

¶ 97    Joseph acknowledged that he spoke with the police about the shooting shortly after it occurred. He agreed that he reported that he saw the defendant on the scene, but he did not remember telling the police that "there was a lot of stuff going on" at the time of the shooting. He denied stating that he was wearing earbuds when the shooting occurred. Further, he asserted that

24

he was scared when speaking to the police, in part, because they accused him of being involved in the shooting. Joseph testified that he did not know the identity of the shooter. Additionally, he stated he never received any phone calls about the case from the defendant's trial attorney. If he had, he would have spoken with the attorney and been willing to testify at the defendant's trial.

¶ 98 On cross-examination, Joseph acknowledged that he only saw the back of the person that he observed running away from the shooting, not the person's face, and that he did not see the person holding a gun. He agreed that when he previously spoke with the police, he told them he "heard nothing" and "seen nothing." Joseph acknowledged that he might have reported that he was talking on the phone with his girlfriend when the shooting happened and that he was not sure that he heard the gunshots because there was a train going by and a lot of noise. He did not remember the police asking him if he saw anyone run away from Caston's vehicle. Additionally, he asserted his memory of the event was "probably better" at the time of the evidentiary hearing than it was at the time of the incident. Finally, Joseph acknowledged having a criminal history that included two prior felony convictions for possession of a firearm by a felon and a felony conviction for "theft with a prior."

¶ 99 The State presented testimony from Detective Baltzell, who investigated the shooting. Baltzell testified he interviewed Joseph, and he identified a video recording of that interview. The State moved for the admission of the video, and the defendant's postconviction counsel objected based on "a discovery issue," arguing she had not seen the video. According to postconviction counsel, the trial attorney, who was then deceased, "had completely destroyed [his] file" and she had difficulty obtaining discovery from the State. Postconviction counsel acknowledged, however, that "[t]he State provided the discovery in the eleventh hour," enabling her to file the defendant's postconviction petition, and that she had not asked the trial court for assistance in obtaining any

25

discovery. In response, the State maintained that it had "disclosed the entire file" to postconviction counsel. The State asserted that once it was established that the trial attorney's file was not available, it sent postconviction counsel "everything along with directions that all of the materials should be here." The State maintained that postconviction counsel voiced no complaints thereafter.

¶ 100 The circuit court overruled defendant's objection and allowed the video of Joseph's interview to be admitted. It stated that defendant would be entitled to a continuance if needed "to be able to find evidence or come up with argument to contradict this video." Ultimately, postconviction counsel did not request a continuance.

¶ 101 The video of Joseph's interview was published at the hearing. During the interview, conducted by Detective Baltzell and Detective Funkhouser, Joseph reported that he did not see the shooting and did not see anyone running away from Caston's vehicle. He indicated he was not sure whether he heard gunshots and that his attention was not drawn to the area of the shooting until he heard Caston's vehicle pulling away. He further reported that there had been music playing, people talking, children playing, and the sounds of a train. Joseph maintained that he had been on his phone with his earbuds in and he did not see or hear anything.

¶ 102 Detective Baltzell denied that before the interview, either he or Detective Funkhouser suggested to Joseph that he was a suspect in the case. According to Detective Baltzell, the police already had the name of the person who was alleged to have committed the crime. On cross-examination, he acknowledged that other individuals he spoke with indicated that Joseph had been involved in the incident. When he interviewed Joseph, it was his intention to determine if Joseph drove the defendant to the scene of the shooting.

¶ 103 In rebuttal, Joseph testified that the reason he agreed to be interviewed was because the police "were saying that *** [he] did it." He stated he had concerns because he was on parole, and

26

he was scared the detectives would inform his parole officer about the incident. Joseph maintained that at the time of the interview, he was trying to distance himself from the shooting.

¶ 104   The defendant also testified at the hearing on his own behalf. He asserted he retained his trial attorney to represent him at his trial. During that representation, he had discussions with his attorney about calling certain witnesses, including Joseph and Boykins. According to the defendant, his attorney stated that they "didn't need" Joseph and he never responded to the defendant's request to call Boykins. It was the defendant's opinion that his attorney was "rushing" him to trial because the defendant was not paying him enough money.

¶ 105   On November 10, 2021, the trial court entered a written order, finding that the defendant failed to prove a violation of his constitutional rights and denied his postconviction petition. The court found that the defendant's claims with respect to Boykins were waived because she was not called to testify at the evidentiary hearing. With respect to the defendant's claim that his trial attorney was ineffective for failing to investigate or call Joseph as a witness, the court determined that the defendant had not established either that his attorney's performance was deficient or that the defendant suffered prejudice. Initially, the court stated that given Joseph's prior statements to the police—indicating he was not paying close attention to the area of the shooting and did not see anyone running away—the defendant's attorney had no valid reason to contact Joseph or call him as a witness at trial. It also concluded that there were strategic reasons not to call Joseph, including that Joseph was a convicted felon on parole and because his credibility could have been attacked.

¶ 106   Regarding prejudice, the circuit court stated it had "serious doubts about [Joseph's] credibility" and that it did not believe Joseph's testimony would have changed the outcome of the defendant's trial. In particular, the court stated as follows:

"[Joseph] has felony convictions which the Court can consider as to his credibility. He also admitted on the stand that he lied to police officers because he was on parole at the time and was near a shooting, he did not want [to be] implicated. He claims that the police questioning him were threatening and pressuring him[.] However, the video of the questioning does not show threats at all[.] In fact, [Joseph] received a phone call [during the interview] and officers said he would not be there long[.] Incredibly, [Joseph] stated that his memory of the event was better in 2021 than it was in 2015[.] On the stand[,] he was defensive about prior statements, not recalling many he made to the police[.] While it is true that he does not appear to have anything to gain now, since he does not know the Defendant, on balance, the Court has concerns about his credibility[.]"

¶ 107   The court further stated that even if a jury had found Joseph was credible, his testimony was "of limited assistance to the issue of who the shooter was." In particular, the court noted the person Joseph described as the shooter was running away from him. Joseph did not see the person's face or see the person with a gun.

¶ 108   On December 27, 2022, the appellate court entered its order affirming the trial court's order dismissing some of his postconviction claims at the second stage of the proceedings, finding that the defendant did not establish that his postconviction counsel provided unreasonable assistance at the third-stage evidentiary hearing, and finding that his postconviction counsel provided reasonable assistance and adequately framed and/or supported his claims. *People v. Beverly*, 2022 IL App (4th) 210677-U.

¶ 109                    C. Successive Postconviction Petition

¶ 110   On January 7, 2022, the defendant sought leave of court to file a successive postconviction petition. The defendant raised an actual innocence claim with newly discovered evidence in the

28

form of an eyewitness, Kamari Ray-Davis (Ray-Davis). Ray-Davis was present at the barbeque and witnessed the shooting. He was 15 years old at the time of the events. Champaign Officer Robert Delong was involved in the search for the shooter. Officer Delong stopped Ray-Davis and three other males to ask if they had been present when the shooting occurred. Officer Delong stated that Ray-Davis acknowledged being present and that he heard the gunshot. An attorney allegedly attempted to interview Ray-Davis, but the request was declined by his parents who did not want their son to be involved in this case. The record contains no detail about the identity of the attorney and/or whether the attorney was representing the State or the defendant.

¶ 111 In November 2021, the defendant met Ray-Davis, who shared what he witnessed. The defendant's petition for leave to file a successive postconviction petition contained a notarized affidavit signed by Ray-Davis. What follows is the entirety of this handwritten affidavit:

"Kamari Ray-Davis was attending a going away party for David Dalton A.K.A. Pookie in the late afternoon of 4-10-15. I got there a little after 3:00 pm. I really wasn't for the barbeque. I was walking from the Arab store which is around the corner[,] and I walked through Oak Wood Trace Apts which I did often and the BBQ was already going. I seen a dice game and that made me stay. I remember seeing Glock A.K.A. David Beverly stand by the dice game wearing a black hoodie and blue gloves which looked goofy (And I remember laughing at him. We were all kicking it for a minute[)]. Then I remember seeing him leave with a dark[-]skinned girl with glasses about a hour or so after I arrived. I would say around (4:00-4:30 pm)[.] I remember seeing this S.U.V. leave and come back multiple times to the BBQ with a female driver and male passenger. There was multiple people standing around the S.U.V. when it was parked in Oak Wood Trace Apts. Right before the shooting occur[r]ed[,] the same crowd that was hanging around the S.U.V. was back

29

gatherer[e]d around [the] S.U.V. As I was just about to leave [the] dice game[,] I seen the female driver get into an argument with two guys about something. Then one of the guys went toward [the] entrance by the park and the other one hopped in the backseat. As I walked into the parking lot towards the middle of the parking lot, I seen the S.U.V. leaving out the parking space and the passenger was getting into it with the same guy that walked of[f] as he walked back up. He was wearing an all black jogging suit and was light skinned but of darker tone and he had an afro that was nappy. He was musc[u]lar in size. He had no tattoos from what I remember. This guy walked up and shot one time into the passenger side of the car. The shooter then ran off toward Bradle[y] Ave. and I ran with [the] rest of [the] crowd towards the park. When I got home[,] I told my mom what happen[e]d and she told me not to get involved. I remember a lawyer calling my house[,] but my family told him I wasn't getting involved. I was 15 years old at the time. Since 2015 I've changed address and phone number multiple times so if anybody tried to contact me[,] it would be hard. I ran into David Beverly A.K.A. Glock in the county[,] and he asked me to write an affidavit stating what I saw. Nobody is making me write this statement or am I rec[ei]ving anything for writing this statement."

¶ 112   The trial court denied the defendant's petition for leave to file a successive postconviction petition on January 19, 2022, without a written order. The court stated that it did not find that Ray-Davis's affidavit presented newly discovered evidence because Ray-Davis's identity was available at the time of trial and could have been discovered with due diligence. The court also noted that in the defendant's amended postconviction petition alleging ineffective assistance of trial counsel, his postconviction attorney listed numerous witnesses that trial counsel could have interviewed. The court stated that Ray-Davis could potentially have been discovered during the postconviction

30

proceedings. The court also found that the "new evidence" did not raise a colorable claim of actual innocence. The court noted: "Mr. Davis gives a description in his affidavit that's different from Ms. Caston. That might ordinarily make me think that this is of such character that it could change the outcome of the trial." However, the court discounted Ray-Davis's affidavit, and concluded that Ray-Davis's testimony could not change the outcome of trial because at the time of the shooting, he told police that he merely heard the shooting, and thus, "[h]e's changed his story."

¶ 113                                    D. Resentencing

¶ 114    The resentencing hearing was held on January 19, 2022. The defendant was not present in the courtroom and was appearing via Zoom. The attorney representing the State and his attorney were in person in the courtroom. At the outset of the hearing, the following occurred:

> "THE COURT: Sir, before we get started here[,] I want to make sure you understand what your rights are. You do have the right to be personally present in the courtroom but because of COVID concerns the jail's not transporting people, so if you wanted to be here in person[,] we'd have to continue this several weeks. Otherwise, you have the right to give up being here personally and we can do this by Zoom. What that would mean is that the lawyers and I would be here in the courtroom[,] and you would be at the jail appearing by Zoom. You would not be physically next to your lawyer, but there's no legal difference whether you're here in court or whether you do it remotely. It's identically the same.
>
> Do you understand all of that, sir?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Have you had a chance to talk to Ms. Propps [the defendant's attorney] about this?

31

THE DEFENDANT: Yes, sir.

THE COURT: And do you want to proceed by Zoom like this? Is that what you would like to do sir?

THE DEFENDANT: Is there—is there any way I can talk to my lawyer first[,] or no?

THE COURT: Well, the—

THE DEFENDANT: (unintelligible.)

THE COURT: Yes. We'll figure this out. We'll be in recess briefly; okay? Stay where you are.

\* \* \*

THE COURT: We are back on the record in 15-CF-510.

The Defendant appears by Zoom. Ms. Propps appears in court, as does Mr. Lozar [the attorney representing the State].

Mr. Beverly, where I left off with you was telling you that you have the right to be here in person[,] but we can also proceed with his hearing today by Zoom, and I just wanted to make sure you understood everything.

Would you like to proceed by Zoom today or are you asking that we set this over a couple weeks and appear in person? Which would you like to do sir?

THE DEFENDANT: We can proceed.

THE COURT: All right.

THE DEFENDANT: We can proceed.

THE COURT: All right. Thank you.

We'll show that he has discussed this with counsel, and I find that his decision is knowing and voluntary."

¶ 115 The trial court commented upon the original presentence investigation report dated February 22, 2016, and the updated report dated January 13, 2022. The court specifically noted that although he was going to be considering the defendant's prior record, he would not be considering the weapons charge "which is the one that I'm not allowed to consider."

¶ 116 In aggravation, the State asked the trial court to consider the prior sentencing hearing, as well as the events and facts of this case. Additionally, the State called Brandy Coakley (Coakley) and Darlene Dobynes (Dobynes) to testify.

¶ 117 Before Coakley began her testimony, the trial court adjusted the video toward her so that the defendant could see her while she was testifying. Coakley's brother was the victim in this case. Numerous other family members were present, but she was "elected" to represent the family during the hearing. Coakley testified that the persons most impacted by the loss of her brother were his two children—a daughter who was then 10, and a son who was then 6. Coakley testified that her nephew did not really know who his father was, but that her niece was affected by the loss, stating that she did not want to visit the victim's mother, because of the resemblance to her deceased father. Coakley testified that all family members were impacted by the victim's loss stating that he was everyone's favorite. Coakley testified to the difficulties her mother has experienced since her son was killed.

¶ 118 Dobynes testified that she was the victim's mother. She stated that while the defendant's family can still see him, even if seeing him is via Zoom, she can no longer hug her child and can only see him in spirit. Dobynes testified that before his death, her son had stopped "all this mess,"

and was trying to get his life together. She testified that her son was a good person, and she believed that his death has caused her to suffer from medical issues.

¶ 119   The defendant presented no evidence in mitigation.

¶ 120   After arguments of counsel, the defendant read a statement he prepared. The defendant noted that he had been incarcerated since 2015, but that he had become a better person. He spoke of his ability to obtain education while in prison, but that if he is given a lengthy sentence, he would have no ability to use that education. Noting his imperfections, the defendant stated that his situation was one placed upon him. He concluded by expressing his empathy for the family of the victim.

¶ 121   The judge presiding over the defendant's resentencing hearing indicated that although he had not been the trial judge, he had read the trial and appellate court records and transcripts. The judge also indicated the two presentence investigation reports were considered, and specifically noted that he was not considering "that one criminal conviction which the Appellate Court said should not be considered." The court stated that it had considered all relevant statutory aggravating and mitigating factors. In mitigation, the trial court considered the fact that the defendant had a six-year-old child but stated that it may not rise to a level constituting statutory mitigation. In aggravation, the trial court noted the defendant's previous criminal history beginning with his juvenile record of violent offenses including robbery and armed robbery. Adult offenses ranged from misdemeanors to Class 2 felonies involving theft, stolen vehicles, and similar crimes. The court also noted that the defendant also had misdemeanor batteries. The court considered the deterrence factor, and the specific facts of this case: that the shooting was in a crowded area, the victim was unarmed, and the shooting was during daylight. The court stated:

34

"It was a barbecue during daylight hours, perhaps a hundred people nearby. A bullet could have gone through the victim and hit somebody else. There could have been other bullets flown from that gun that Mr. Beverly had. Other people potentially could have drawn weapons. It could have turned into quite a dangerous situation because of what Mr. Beverly did to start it off and so others potentially were threatened with physical harm. Again, unarmed victim in the daylight."

The court noted that the defendant was relatively young, had a difficult upbringing with behavioral and school issues, and had used alcohol and drugs in the past. Since being incarcerated, the defendant had been diagnosed with posttraumatic stress disorder and depression. The court referenced the impact that the victim's murder had on his family. The trial court sentenced the defendant to 65 years, 40 years for first degree murder plus the mandatory 25-year firearm enhancement.

¶ 122                                  II. ANALYSIS

¶ 123   The defendant filed this appeal contesting the denial of his request for leave to file a successive postconviction petition, the legality of his presence via Zoom at his resentencing hearing, and his sentence.

¶ 124                      A. Successive Postconviction Petition

¶ 125   The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)) provides a procedural process by which a defendant may assert that the conviction resulted from a substantial denial of constitutional rights. *Id.* § 122-1(a); *People v. Delton*, 227 Ill. 2d 247, 253 (2008). "The Act contemplates the filing of only one postconviction petition and provides in section 122-3 (725 ILCS 5/122-3 (West 2014)) that '[a]ny claim of substantial denial of

35

constitutional rights not raised in the original or an amended petition is waived.' " *People v. Bailey*, 2017 IL 121450, ¶ 15.

¶ 126 The wrongful conviction of an innocent person violates due process under the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 2), and thus, a defendant can raise a freestanding claim of actual innocence based on newly discovered evidence in a postconviction petition. *People v. Robinson*, 2020 IL 123849, ¶ 43. However, a petitioner must obtain leave of court to file a successive postconviction petition even when raising a claim of actual innocence. 725 ILCS 5/122-1(f) (West 2020). Typically, when a defendant seeks leave to file a successive postconviction petition, the defendant must make a *prima facie* showing of both cause for the failure to bring the claim in the initial postconviction proceedings and prejudice resulting from that failure. *Id.*; *People v. White*, 2020 IL App (5th) 170345, ¶ 18 (citing *Bailey*, 2017 IL 121450, ¶ 24). However, where the defendant raises a freestanding claim of actual innocence, the defendant is not required to meet the cause-and-prejudice test. *People v. Ortiz*, 235 Ill. 2d 319, 332 (2009). Instead, the defendant must show a colorable claim of actual innocence. *Id.* at 330. To raise a colorable claim of actual innocence, "the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *Robinson*, 2020 IL 123849, ¶ 47 (citing *People v. Edwards*, 2012 IL 111711, ¶ 32); *People v. Morgan*, 212 Ill. 2d 148, 154 (2004).

¶ 127 The trial court should only deny a petition for leave to file a successive postconviction petition "where it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence." *Robinson*, 2020 IL 123849, ¶ 44. In the pleading stage of all postconviction cases, "all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be

36

taken as true." *Id.* ¶ 45. When a trial court decides the legal sufficiency of a postconviction petition, the court is not permitted to make factual and credibility determinations. *Id.* On appeal from the denial of a successive postconviction petition alleging actual innocence, our review is *de novo. Id.* ¶ 40.

¶ 128   Evidence is deemed to be "newly discovered" when it was unavailable at trial and it could not have been discovered sooner through due diligence. *Id.* ¶ 47; *Ortiz*, 235 Ill. 2d at 334. "In advancing an actual innocence claim, it is the *evidence* in support of the claim that must be 'newly discovered,' not necessarily the source." (Emphasis in original.) *People v. Class*, 2023 IL App (1st) 200903, ¶ 76 (citing *People v. Fields*, 2020 IL App (1st) 151735, ¶ 48). Accordingly, "an affidavit from a witness may be newly discovered, even when the defense knew of the witness prior to trial." *Fields*, 2020 IL App (1st) 151735, ¶ 48 (citing *People v. White*, 2014 IL App (1st) 130007, ¶ 20).  Evidence is "material" if the evidence is relevant and probative of the defendant's innocence. *People v. Parker*, 2012 IL App (1st) 101809, ¶¶ 83-84. The most important element of an actual innocence claim is the conclusive character of the new evidence. *Robinson*, 2020 IL 123849, ¶ 47; *People v. Washington*, 171 Ill. 2d 475, 489 (1996).

¶ 129   The court must also consider whether the new evidence places the trial evidence in a different light and undermines confidence in the verdict. *Robinson*, 2020 IL 123849, ¶ 48; *People v. Coleman*, 2013 IL 113307, ¶ 97. The new evidence does not need to be dispositive to modify the original guilty verdict. *Robinson*, 2020 IL 123849, ¶ 48. "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.* (citing *People v. Davis*, 2012 IL App (4th) 110305, ¶¶ 62-64).

¶ 130 Here, the defendant claims that the proffered eyewitness testimony of Ray-Davis would be in direct contradiction to Caston's trial testimony. Ray-Davis was present at the barbeque that day and saw the defendant at the party. The defendant was engaged in a dice game and was then wearing blue latex gloves. Ray-Davis would also testify that later that day he saw the shooting, and that the defendant was not the shooter. He would testify to what the shooter looked like and was wearing, which was not consistent with the defendant's look and attire on the day of the shooting. The defendant argues that if a jury heard Ray-Davis's testimony, he could be found innocent of the murder.[1]

¶ 131 While we are aware that Ray-Davis was "interviewed" by a law enforcement officer in the investigation of the shooting, and thus his name was included in the discovery documents, all that was known about Ray-Davis was that he heard the shooting—not that he directly witnessed the shooting. An attorney apparently attempted to speak with Ray-Davis before the underlying trial in this case. However, Ray-Davis did not speak with this attorney because his parents would not allow their juvenile son to be interviewed or otherwise "get involved" in this criminal case. Additionally, Ray-Davis stated that in the intervening years from the date of the shooting until he submitted his affidavit, he had moved multiple times and changed telephone numbers. Thus, he would not have been easy to locate.

¶ 132 The trial court concluded that the evidence was not "newly discovered," because Ray-Davis's name was in the Champaign police officer's report, and thus was theoretically

---

[1]Although the State alleged that there was physical evidence connecting the defendant to the crime in the form of a black hooded sweatshirt and 9-millimeter bullets found in his girlfriend's apartment, the State is mistaken about where those evidentiary items were recovered. The record establishes that those items were recovered from the apartment of Deveonta Lindsey's girlfriend. Lindsey is the individual who was speaking with Dreshana Caston's brother at her vehicle, and who also gave Caston a "mean look" just prior to the shooting. At the time of the shooting, witnesses reported that Lindsey was wearing a black hoodie.

discoverable by the defendant before his trial, or at the time of his postconviction proceedings. We find that the trial court's basis for its decision is inconsistent with Illinois law because the court focused on the possibility that Ray-Davis's identity was discoverable before trial or during postconviction proceedings, instead of focusing on the "newness" of the evidence involved. *Class*, 2023 IL App (1st) 200903, ¶ 76 (citing *Fields*, 2020 IL App (1st) 151735, ¶ 48). Moreover, by discounting Ray-Davis's statements in his affidavit that he witnessed the shooting when compared to his original claim to law enforcement that he merely heard the shooting, the trial court improperly focused on Ray-Davis's credibility as a witness. *Robinson*, 2020 IL 123849, ¶ 45. We are reminded that in the pleading stage of a successive postconviction petition, "all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true." *Id.*

¶ 133   We find that this proffered testimony constitutes newly discovered evidence. Moreover, even though Ray-Davis's name was in the investigative reports, we cannot conclude that the defendant could have discovered this new evidence in the exercise of due diligence. Regardless of whether Ray-Davis was discoverable to the defendant at the time of trial or during his postconviction proceeding, the evidence that Ray-Davis provided in his affidavit asserting that the defendant was not the shooter constitutes new and material evidence. *Class*, 2023 IL App (1st) 200903, ¶ 76 (citing *Fields*, 2020 IL App (1st) 151735, ¶ 48).

¶ 134   Having satisfied the first two requirements of an actual innocence claim, the defendant must establish that this new evidence places the trial evidence in a different light and undermines confidence in the verdict. *Robinson*, 2020 IL 123849, ¶ 48; *Coleman*, 2013 IL 113307, ¶ 97. After reviewing the evidence and considering the reasonable doubt standard, we conclude that confidence in the guilty verdict has been undermined. The opposing testimony eyewitnesses

39

Caston and Ray-Davis, coupled with the lack of physical evidence connecting the defendant to this murder, supports our decision. Having found that the defendant satisfied all three requirements of an actual innocence claim, we reverse the trial court's denial of the defendant's petition for leave to file a successive postconviction petition and remand for further proceedings consistent with this order.

¶ 135                    B. Zoom Presence at Resentencing Hearing

¶ 136   The defendant also asks this court to remand the case for a new resentencing hearing on the basis he was not present in person, while everyone else was physically present in the courtroom. He alleges that this process did not adequately fulfill his constitutional right to be present, and that he did not knowingly and voluntarily waive his right to an in-person hearing. We review the issue of a defendant's waiver to be present at sentencing on a *de novo* basis. *People v. Liss*, 2012 IL App (2d) 101191, ¶ 10 (citing *People v. Breedlove*, 213 Ill. 2d 509, 512 (2004)). When a defendant appears remotely at a court proceeding and fails to object, the lack of objection is construed as consent, and the defendant waives the issue for review unless he can show plain error. *People v. Lindsey*, 309 Ill. App. 3d 1031, 1034 (2000).

¶ 137   "[T]he federal constitution and our state constitution afford criminal defendants the general right to be present, not only at trial, but at all critical stages of the proceedings, from arraignment to sentencing." *People v. Lindsey*, 201 Ill. 2d 45, 55 (2002). This right to be present is largely based upon the confrontation clause of the sixth amendment. *People v. Stroud*, 208 Ill. 2d 398, 408 (2004) (quoting *United States v. Gagnon*, 470 U.S. 522, 526 (1985)). " '[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.' " *Id.* (quoting *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987)).

40

¶ 138 However, " 'a defendant is not denied a constitutional right every time he is not present during his trial, but only when his absence results in a denial of an underlying substantial right, in other words, a constitutional right; and it is only in such a case that plain error is committed.' " *Lindsey*, 201 Ill. 2d at 57 (quoting *People v. Bean*, 137 Ill. 2d 65, 81 (1990)). Thus, a defendant's absence from a critical proceeding violates his constitutional rights "only if the record demonstrates that defendant's absence caused the proceeding to be unfair or if his absence resulted in a denial of an underlying substantial right." *Id.*

¶ 139 The Illinois legislature and the Illinois Supreme Court have both addressed the issues of remote participation in criminal proceedings. Pursuant to section 106D-1 of the Code of Criminal Procedure of 1963, the chief judge of an Illinois circuit court may permit a criminal defendant to appear by two-way audio-visual communication, including computerized video conference for specified procedural hearings. 725 ILCS 5/106D-1(a) (West Supp. 2021). However, sentencing is not included on that list of specified hearings. Subsection (c) of the statute—in effect as of the date of the defendant's resentencing—stated: "Nothing in this Section shall be construed to prohibit other court appearances through the use of two-way audio-visual communication, upon waiver of any right the person in custody or confinement may have to be present physically." *Id.* § 106D-1(c). Illinois Supreme Court Rule 45, in effect on the date of the defendant's sentencing, also allows a criminal defendant to participate remotely in a hearing, including by telephone or video conference, so long as the procedures employed during the hearing are "consistent with constitutional guarantees." Ill. S. Ct. R. 45 (eff. May 22, 2020). In its committee comments, the supreme court stated:

> "The use of telephone or video conferences was formally contained in Article II—
>
> Rules on Civil Proceedings in the Trial Court as Supreme Court Rule 185 (Telephone or

Video Conferences). New Rule 45 recognizes that telephone and video conferences can be used effectively and appropriately in other types of proceedings beyond civil cases. As indicated in the rule, special attention must be given to the use of telephone or video conferencing in criminal or juvenile delinquency proceedings. Continued study as this technology evolves will be necessary to ensure the constitutional guarantees applicable to such proceedings are consistently provided." Ill. S. Ct. R. 45, Committee Comments (adopted May 22, 2020).

¶ 140   Here, there is no question that the defendant verbally agreed to participate in his sentencing hearing remotely via Zoom. Therefore, the question we must decide is whether the defendant's constitutional right to an in-person sentencing was violated, and thus, if plain error review of his claim would be appropriate. *Lindsey*, 201 Ill. 2d at 57.

¶ 141   A reviewing court is allowed to excuse a defendant's forfeiture using the plain error doctrine in two limited circumstances. *People v. Bailey*, 2020 IL App (5th) 160458, ¶ 73. We may review a forfeited claim "if the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or if the error is "so fundamental that it undermined the fairness of the defendant's [sentencing] and threatened the integrity of the judicial process." *Id.* (citing *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). The defendant argues that plain error review is appropriate under the second prong of the plain error rule.

¶ 142   For the reasons that follow in this order, we disagree and conclude that the trial court did not commit error, and thus, the fairness of the defendant's resentencing was not undermined.

¶ 143   The Illinois Supreme Court has found that a defendant's right to be present at critical criminal hearings was violated when a guilty plea was entered via a closed-circuit television feed

42

and the defendant was not advised of his right to be present, nor did he waive that right. *Stroud*, 208 Ill. 2d at 409. This case is factually quite different than the facts in *People v. Stroud*. Here, due to transportation limitations resulting from COVID-19, the defendant was not able to be transported from the county jail to the courthouse for resentencing. He appeared via Zoom. The trial court judge adequately explained to the defendant that the judge and the attorneys would be present in the courtroom, and he would be appearing remotely by Zoom. The judge reiterated that the defendant would not be physically next to his attorney, but regardless, the process would be the same. The judge explained that if the defendant wanted to be in the courtroom during his resentencing, the hearing would be continued. The defendant was then provided an opportunity to consult with his attorney through Zoom. Following that discussion, the defendant stated that he agreed to the remote sentencing versus having the sentencing rescheduled for a later date when he could physically be in the courtroom. The judge stated that he found the defendant's waiver of the in-person hearing was knowing and voluntary.

¶ 144  We note that the defendant asks us to consider the amended Rule 45, which addresses a defendant's waiver of his right to certain in-person court appearances, including sentencing, and its direction to trial judges presiding over remote sentencing. Ill. S. Ct. R. 45(d)(3)(iii) (eff. Jan. 1, 2023). This rule provides specific guidance to judges to confirm that the defendant's in-person waiver is knowing and voluntary and that the defendant understands the following five applicable matters: (1) that he has a right to be physically present in the courtroom; (2) that a remote appearance means that the defendant will participate via telephone, video conference, or other electronic means; (3) that a remote proceeding may result in the defendant and his attorney not being physically present together; (4) that the legal effect of the remote proceeding is identical to

43

an in-person proceeding; and (5) that the defendant has discussed the waiver with counsel.[2] While we appreciate the clarity that this new rule provides to trial judges, this amendment to Rule 45 was not in effect on the date of the defendant's resentencing. However, after reviewing the transcript of the hearing, we find that the judge substantially complied with these requirements in concluding that the defendant's waiver of his in-person sentencing was knowing and voluntary.

¶ 145   The record and the law do not support a conclusion that the defendant's in-person absence from the sentencing hearing caused the proceeding to be unfair. *Lindsey*, 201 Ill. 2d at 57. The defendant was represented by counsel and had the opportunity to confer with his attorney before the sentencing began. The trial court provided the defendant with the option to continue the hearing to a later date so that he could be present in the courtroom. The defendant declined the continuance opportunity the court offered. The trial court moved the camera during the hearing to allow the defendant to see and hear the witnesses testify and present their victim impact statements. The defendant addressed the court and the members of the victim's family with his prepared statement. While a remote criminal proceeding is not always ideal, the record in this case fails to support a conclusion that the defendant's constitutional rights were violated. We find that the defendant was not denied an underlying substantial right by his remote presence at his resentencing. *Id*. Accordingly, we conclude that plain error review is not applicable in this case, and that the defendant waived the issue because he failed to object to his remote appearance.

---

[2]There is a sixth matter that is not applicable in this case, and so we chose not to include it in the list: "That in matters open to the public, any remote appearance may be viewable by the public over the Internet or other method of streaming or broadcasting (if applicable)." Ill. S. Ct. R. 45(d)(3)(iii)(C) (eff. Jan. 1, 2023).

¶ 146                           C. Sentence

¶ 147   The defendant asks this court to grant him a new sentencing hearing because the trial court improperly considered a factor in aggravation that was already the subject of the 25-year firearms enhancement. Secondly, the defendant alleges that 65-year sentence imposed by the court amounts to a *de facto* life sentence and argues that this sentence is inconsistent with the trial court's implicit rejection of a sentence of natural life.

¶ 148   Here, the defendant failed to raise these issues by objection or in a postsentencing motion, and thus the issues were forfeited. *People v. Newlin*, 2014 IL App (5th) 120518, ¶ 21 (explaining that to preserve an issue for appellate review, a defendant must both object contemporaneously and include the issue in a written postsentencing motion). He asks this court to consider these two issues pursuant to the second prong of plain error review. Under the second prong of this doctrine, we may consider claims of error that have been forfeited if the error alleged is of such a magnitude that it undermined the fairness of the defendant's trial and the integrity of the judicial process. *Bailey*, 2020 IL App (5th) 160458, ¶ 73 (citing *Piatkowski*, 225 Ill. 2d at 565). The first step in plain error review is to determine whether any error occurred at all. *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 7.

¶ 149                    1. *Improper Consideration of Factor in Aggravation*

¶ 150   The appropriate sentencing range for first degree murder is 20 to 60 years. 730 ILCS 5/5-4.5-20(a) (West 2020). When there is a finding that a firearm was discharged in the commission of the murder, and that the firearm discharge proximately caused the death, the sentenced imposed for murder shall be enhanced by an additional 25 years, or up to a term of natural life. *Id.* § 5-8-1(a)(1)(d)(iii). The Illinois legislature explained the intent behind the enactment of the firearm

enhancement, noting "the serious threat to the public health, safety, and welfare caused by the use of firearms in felony offenses." *People v. Sharpe*, 216 Ill. 2d 481, 531 (2005).

¶ 151 "A reasoned judgment as to the proper penalty to be imposed must be based on the particular circumstances of each individual case." *People v. Morrow*, 2014 IL App (2d) 130718, ¶ 12 (citing *People v. Saldivar*, 113 Ill. 2d 256, 268 (1986)). That judgment differs from case to case and " 'depends upon many relevant factors, including the defendant's demeanor, habits, age, mentality, credibility, general moral character, and social environment [citations], as well as the nature and circumstances of the offense, including the nature and extent of each element of the offense as committed by the defendant [citations].' " *Id.* (quoting *Saldivar*, 113 Ill. 2d at 268-69). Other factors that can be considered include the defendant's criminal history, his potential for reform, the recognized interest in protecting the public, and the interest in deterrence. *Id.* (citing *People v. Wilson*, 257 Ill. App. 3d 670, 704-05 (1993). " 'The trial court is in the best position to balance the appropriate factors and tailor a sentence to the needs of the case.' " *Id.* (quoting *Wilson*, 257 Ill. App. 3d at 704).

¶ 152 A sentence within the statutorily prescribed range is presumed to be proper. *People v. Hampton*, 2021 IL App (5th) 170341, ¶ 136. In addition, there is a strong presumption that the trial court made its sentencing decision based on correct legal reasoning. *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 7. A defendant can only overcome this presumption "by an affirmative showing that the sentence imposed varies greatly from the purpose and spirit of the law or manifestly violates constitutional guidelines." *Id.* ¶ 8; see also *People v. Canizalez-Cardena*, 2012 IL App (4th) 110720, ¶ 22.

¶ 153 However, the trial court may not use "a factor implicit in the offense" as an aggravating factor in sentencing the defendant for that offense. *Morrow*, 2014 IL App (2d) 130718, ¶ 13 (citing

*People v. Ferguson*, 132 Ill. 2d 86, 07 (1989). "This prohibition against double enhancements is based on the assumption that, in designating the appropriate range of punishment for an offense, the legislature necessarily considered the factors inherent in the offense." *Id.* (citing *People v. Rissley*, 165 Ill. 2d 364, 390 (1995)).

¶ 154   Although a reviewing court typically reviews a sentence on a discretionary basis, if the trial court relied upon an improper factor at sentencing, the question presents a matter of law, and thus our review is *de novo. People v. Arbuckle*, 2016 IL App (3d) 121014-B, ¶ 39; *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8.

¶ 155   The reviewing court will not vacate a sentence unless it is evident that the trial court relied upon an improper factor. *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 49. The burden to affirmatively establish that the trial court's sentence was based on an improper factor lies with the defendant. *People v. Williams*, 2018 IL App (4th) 150759, ¶ 18.

¶ 156   In determining whether the trial court erroneously considered a factor inherent in the offense in aggravation, we must view the record in its entirety rather than focusing on isolated statements made by the court. *Morrow*, 2014 IL App (2d) 130718, ¶ 14. The defendant is required to establish "more than the mere mentioning of an improper fact" to obtain a remand for resentencing. *People v. Reed*, 376 Ill. App. 3d 121, 128 (2007). "Rather, defendant must show that the trial court relied on the improper fact when imposing sentence." *Id*. However, the appellate court is not required to remand if we determine that the weight placed on that factor was insignificant. *People v. Sanders*, 2016 IL App (3d) 130511, ¶ 13.

¶ 157   At sentencing, the trial court considered the defendant's conduct on the day of the murder in stating that the defendant's actions could have caused additional harm. "The commission of any offense, regardless of whether the offense itself deals with harm, can have varying degrees of harm

47

or threatened harm." *Saldivar*, 113 Ill. 2d at 269. We find that the trial court's statement that the offense could have caused additional harm to other people was proper consideration of the degree of harm suffered by the victim and the community. Obviously, firing a weapon in a suburban area is inherently dangerous. Although the trial court referenced that danger, the record fails to establish that the court relied upon this factor in sentencing the defendant. Accordingly, we find that the trial court did not commit error in sentencing, and that a plain error analysis is inapplicable.

¶ 158                                    2. *De Facto Life Sentence*

¶ 159   The Illinois Constitution mandates that a sentence must be determined "according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." *People v. Daly*, 2014 IL App (4th) 140624, ¶ 26 (citing Ill. Const. 1970, art. I, § 11). As stated earlier, if the sentence imposed by the trial court is within the statutory range, the sentence is presumptively appropriate. *Hampton*, 2021 IL App (5th) 170341, ¶ 136.

¶ 160   We note that the original sentence imposed by the court was 75 years, whereas on resentencing, the court imposed a 65-year sentence—40 years for first degree murder plus 25 years for the firearm enhancement. 730 ILCS 5/5-4.5-20(a) (West 2020). The defendant argues that since the trial court had the ability to sentence him to natural life (*id.* § 5-8-1(a)(1)(d)(iii)), the trial court implicitly did *not* feel that the defendant deserved a sentence of natural life. Therefore, given the defendant's current age, he argues that his sentence is a *de facto* life sentence because he will not be eligible for release until he is 93 years of age. As the current life expectancy of an Illinois prisoner held in a general prison population is 64 years (see *People v. Sanders*, 2016 IL App (1st) 121732-B, ¶ 26), the defendant contends that the trial court imposed a *de facto* life sentence, which failed to consider the goal of rehabilitation.

48

¶ 161    We have carefully reviewed the transcript of the defendant's sentencing hearing and find that the court was well aware of the defendant's age and his desire to be part of his minor child's life. The court also noted the defendant's difficult upbringing. Yet, there was little else in the way of mitigation. However, the court found that the defendant's past criminal and juvenile offenses, the need for deterrence, the seriousness of the crime, and the impact on the victim's family all warranted the sentence imposed. We find that the defendant has not been able to establish that his 65-year sentence was based upon improper facts or law. *Williams*, 2018 IL App (4th) 150759, ¶ 18. As we find no clear error in the trial court's sentence, we do not reach plain error review.

¶ 162                                III. CONCLUSION

¶ 163    For the above reasons, we reverse the judgment of the Champaign County circuit court denying the defendant's motion for leave to file a successive postconviction petition, and we remand for further proceedings. We affirm the defendant's sentence.


¶ 164    Reversed in part, affirmed in part, and remanded.